305 So.2d 902 (1974)
STATE of Louisiana
v.
Eddie MONROE a/k/a Eddie Bell.
No. 54132.
Supreme Court of Louisiana.
April 29, 1974.
On Rehearing December 2, 1974.
*903 Leon Sarpy, Harvey G. Gleason, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty., Gen., Jim Garrison, Harry F. Connick, Dist. Attys., Louise Korns, Asst. Dist. Atty., for plaintiff-appellee.
SUMMERS, Justice.
Defendant was convicted of murder in 1963 after a trial by jury. He was sentenced to death by electrocution on April 8, 1965. His sentence was commuted to life imprisonment on January 18, 1973, and he was granted an out-of-time appeal on June 20, 1973. Upon this appeal defendant relies upon nine bills of exceptions for a reversal of his conviction and sentence.
The charges against defendant and a codefendant, Kenneth Lee Simmons, arose out of a killing which occurred during the course of an armed robbery perpetrated in the parking lot of the Schwegmann Brothers' Giant Super Market on Chef Menteur Highway, New Orleans. The victim was a 30-year old woman who had been grocery shopping at the supermarket.

Bill 1
This bill of exceptions was reserved when the trial court overruled defense counsel's objections to the admission into evidence of two oral and two written confessions made by the defendant. The basis for the objections was that the confessions were not free and voluntary and that the defendant was not informed that he had a right to counsel or that his statements could be held against him.
The record reveals that the State presented, out of the presence of the jury, no less than six police officers who testified that at the times the two written and the two oral confessions were made, no force, threats, promises or tricks were used to induce the defendant to make statements. One of the officers admitted that prior to the first interrogation he told defendant that he would have to make a statement regarding the murder, but it appears from the record that prior to any statement defendant was informed that he did not have to make a statement if he did not want to talk.
Defendant took the stand and testified that at the time he made the first statement to the police he believed that he had to make a statement and believed that the police might hurt him if he did not. Defendant also testified that some officer, whom he could not identify, had told him that making a statement might help him. Defendant related that he was threatened *904 by the police, was made to sleep in an airconditioned room on a concrete floor and was not allowed to use the telephone. Finally, the defendant testified that his only reason for making the various statements was his fear.
Two of defendant's brothers, one of his sisters-in-law, and two of his acquaintances testified regarding circumstances preceding and following defendant's arrest. The two brothers testified that they were picked up by the police the night before defendant's arrest and were used as decoys to flush defendant out of hiding. The two brothers testified that during the course of their detention by the police they were both beaten with shotguns and fists and were held until it was known that defendant had been apprehended. The sister-in-law testified that she had notified defendant that his brothers had been picked up by the police and had been beaten and that she urged defendant to give himself up. An acquaintance of the defendant, one Trotter Jordan, testified that he saw police beat defendant's brother, Jimmy Monroe. All of this testimony is controverted by the police testimony. Some of these relatives testified that they attempted to see defendant in the jail on numerous occasions, but were refused access.
Defendant's arguments in brief relative to rights of a defendant under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), are not applicable to the case at bar. Trial of this defendant was pre-Miranda and pre-Escobedo. These decisions were held not to be retroactive in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Moreover, this defendant, unlike Escobedo, did not request counsel.
The standard, then, to be used in determining whether the trial court erred in admitting into evidence defendant's confessions is to be found in Sections 451 and 452 of Title 15 as they existed prior to the enactment of the present Code of Criminal Procedure. These provisions state:
"¶ 451. Condition precedent to use of confession: free and voluntary rule
"Before what purposes 1 to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
"¶ 452. Rights of arrested persons as to confession
"No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime."
As pointed out by the State in brief, the trial court's determination that defendant's various confessions were freely and voluntarily given is entitled to great weight and should not be disturbed unless it was clearly erroneous. State v. Hall, 257 La. 253, 242 So.2d 239 (1970), and cases cited therein. Nonetheless, the State has the burden of proving, beyond a reasonable doubt, that the legal requirements for voluntariness have been met. See State v. Skiffer, 253 La. 405, 218 So.2d 313 (1969).
The issue of voluntariness is a question of fact involving to a large extent, as in this case, the credibility of witnesses. When the decision turns on this factor the ruling of the trial judge is entitled to more than the usual weight. There is no error in the ruling here.

Bill 2
Defendant reserved this bill of exceptions when the trial court overruled his objection to the introduction into evidence of oral and written confessions of his codefendant, Simmons. The basis of the objections at trial was that these confessions were obtained without having apprised *905 defendant Simmons of his constitutional rights and that the statements were not free and voluntary. In brief, defendant argues that the admission into evidence of confessions of a codefendant who did not take the stand deprived him of this right to cross-examine the witnesses against him and violates the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which was declared to be applicable to the states and retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968).
The State urges in brief that the harmless error rule regarding a Bruton error, stated in Harrington v. California, 395 U. S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), is applicable to this case. This position is correct, when it is considered that defendant's second written and his second oral confession and Simmon's written confession are substantially identical. See State v. Hooper, 253 La. 439, 218 So.2d 551 (1969), wherein this Court fashioned application of our own Code of Criminal Procedure Article 921 "harmless error" rule to an alleged Bruton situation which closely parallels that presented in this case months before the United States Supreme Court's decision in Harrington came down.
This bill is without merit.

Bill 3
Defendant reserved this bill of exceptions when the trial court refused to allow his cross-examination of witnesses testifying on predicate as to the voluntariness of codefendant Simmons' confession.
This appeal has been taken on defendant Monroe's behalf; we are not here concerned with bills reserved on behalf of defendant Simmons except insofar as they may be, under Code of Criminal Procedure Article 501 (1928 Code of Criminal Procedure), properly advanced on Monroe's behalf and perfected upon this appeal. Defendant does not, upon this appeal, argue that the trial court's ruling as to the admissibility of Simmons' confession was erroneous. While it may be that the trial court's curtailment of defendant's cross-examination of witnesses testifying on the predicate as to the voluntariness of Simmons' confession was a doubtful exercise of the discretion vested in him to control examination of witnesses under Article 369 of the 1928 Code of Criminal Procedure, it is submitted that any error committed was harmless, in light of the facts that there has been no attack on the voluntariness of Simmons' confessions and that the issue of admissibility of defendant's second written confession, which agrees with Simmons' version of the incident, was determined adversely to defendant. See Article 557 of the 1928 Code of Criminal Procedure (analogous to La.Code Crim.Proc. art. 921 "harmless error rule").

Bill 4
According to the bill of exceptions (No. 4) itself, it was reserved when the trial court prohibited the introduction of evidence offered to show the defendant's state of mind at the time of his arrest. In brief, however, defendant argues that he was trying to get before the jury evidence of this state of mind at the time of making the confession.
Evidence of the state of mind of defendant at the time of the arrest, which defendant sought to elicit through the testimony of defendant's brothers, sister-in-law and the acquaintance who arranged his surrender to the police, could have been relevant only insofar as it may have supported an inference that the alleged fear that he experienced at the time of his arrest continued unabated up to the point of, and during the giving of, the four oral and written confessions which spanned a two-day period. Not one of the witnesses whom defendant sought to use to establish state of mind was present at the time that any of the confessions were made. Under these circumstances, defendant's state of mind at the time of the arrest, alleged to *906 have existed because of defendant's knowledge of the alleged beatings sustained by his brothers at the hands of the police was irrelevant.
This bill has no merit.

Bill 5
This bill of exceptions recites that it is taken to the trial court's failure to grant a motion for severance. It further recites that defendant through counsel properly objected to the ruling of the court and reserved a bill of exceptions. However, the minutes do not reflect that the trial court ever formally ruled on this motion. The minutes do reflect that a trial date was set and that both defense counsel concurred in the setting of the trial date. In the "Note of Evidence" contained in the record with the bill, it is recited that there never was a ruling on this motion. The minutes do not reflect a ruling on the motion or an objection and reservation of a bill thereto by defense counsel. It is submitted, therefore, that any objection defendant may have had to the trial court's failure to grant a severance was waived by his failure to note an objection thereto and reserve a bill. See State v. Woodfox, 291 So.2d 388 (La. 1974).
This bill of exceptions is without merit.

Bill 6
This bill of exceptions was reserved to the trial court's denial of a motion for a continuance. The motion complained of the trial court's failure to appoint a Lunacy Commission to inquire into defendant's sanity and alleged that counsel had not had sufficient time to prepare for trial. The pertinent statutory law at the time of this trial provided:
"If before or during the trial the court has reasonable ground to believe that the defendant against whom an indictment has been found or information filed is insane or mentally defective to the extent that the defendant is unable to understand the proceedings against him or to assist in his defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested physicians to examine the defendant with regard to his present mental condition and to testify at the hearing.
. . . . . .
"If the court, after the hearing, decides that the defendant is able to understand the proceedings and to assist in his defense, it shall proceed with the trial.
. . . . . .
"When in the opinion of the court the accused is incapable of understanding the proceedings against him or to assist in his own defense, and the patient is committed to the East Louisiana State Hospital, Central Louisiana State Hospital, or to the State Colony and Training School for observation, examination, and report, the patient shall be examined by the physicians composing the medical staff of the institution without cost to the respective parish from which the patient has been committed." (La.R.S. 15:267).
No evidence is attached to the bill of exceptions to show that the trial court erred when it failed to find reasonable ground to believe that the defendant was insane or mentally defective so as to prevent him from understanding the proceedings against him or from assisting in his defense. Absent evidence tending to show that the trial court ignored evidence that would tend to establish a `"reasonable ground to believe" defendant was so insane or defective as to be unable to stand trial, this Court should not find the denial of the continuance motion error.
Regarding defendant's allegation that his counsel did not have enough time to prepare for trial, such a bare allegation, without supporting facts to show prejudice *907 resulting to defendant from the fact that he had insufficient time to prepare for trial, does not warrant granting defendant relief.
This bill is without merit.

Bill 7
When the trial court denied his application for appointment of a Lunacy Commission, this bill was reserved. A letter from a psychiatrist, Dr. Chappuis, and various letters from defendant's school teachers and acquaintances indicate that these persons were of the opinion that defendant was a mental defective. However, a pretrial hearing was held on defendant's application, at which Dr. Chappuis testified, and the application was denied. It is clear that a determination of capacity to stand trial is a matter for the court's decision. Since Section 267 of Title 15 of the Revised Statutes, quoted in our treatment of Bill 6, supra, places such a decision within the sound discretion of the trial judge, after hearing the only testimony in support of the application (that of Dr. Chappuis), the trial court did not abuse its discretion by refusing to appoint a Lunacy Commission. Especially since defendant did not attach the testimony of Dr. Chappuis at the hearing to this bill. It is difficult to see how such an abuse of discretion could be found without that evidence.

Bill 8
A motion to quash in which it was contended that there was systematic exclusion of blacks from the jury which indicted him was overruled by the trial judge and this bill was reserved. It was stipulated that this case, on the issue of jury discrimination, would be joined with State v. Barksdale, another capital case in which the same inquiry was being made. In Barksdale, on direct appeal from conviction, this Court considered the issue of systematic exclusion and held that there had been no showing of intentional discrimination. See State v. Barksdale, 247 La. 198, 170 So.2d 374 (1964). The United States Supreme Court refused certiorari in Barksdale. 382 U.S. 921, 86 S.Ct. 297, 15 L.Ed. 2d 236.
Since this Court failed to find systematic exclusion in the Barksdale case which would have warranted quashing the indictment, and since the same system being used was that attacked in the instant case, it is not shown that the trial court's failure to grant the motion to quash was error.

Bill 9
This bill of exceptions was reserved when the trial court refused to grant defendant's motion for a new trial. The grounds for the motion were all considered in previous bills of exceptions and the merit vel non of this bill of exceptions necessarily depends on a determination of the merits of the foregoing bills.
For the reasons assigned, the conviction and sentence are affirmed.
BARHAM and DIXON, JJ., dissent with reasons.
DIXON, Justice (dissenting).
Bill of Exceptions No. 1 has merit. The confessions were not free and voluntary since the seventeen-year-old defendant had a below normal IQ of only between fifty-five and sixty-five, according to the testimony of a psychiatrist. In State v. Edwards, 257 La. 707, 243 So.2d 806 (1971), this court ruled admissible as free and voluntary a confession made by an eighteen-year-old youth who was moderately retarded and had an IQ of approximately fifty-nine. I did not participate in that case and disagree with the holding that a low intelligence quotient did not of itself "vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession." Id. at 714, 243 So. 2d at 808. See 32 La.L.Rev. 304 (1972).
*908 Since the crime occurred on March 1, 1963, the Code of Criminal Procedure of 1928 will apply and not the later Code of Criminal Procedure of 1966. Article 451 of the earlier code reads as follows:
"Before what purposes to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
The evidence does not show that this confession was voluntary and free from the influence of fear, but rather otherwise.
Bills of exceptions were reserved when the trial court refused to appoint a lunacy commission. R.S. 15:267 (Acts 1944, No. 261, § 1) provides that the court shall immediately fix a time for a hearing if before or during trial it has reasonable grounds to believe that the defendant is mentally defective "to the extent that the defendant is unable to understand the proceedings against him or to assist in his defense." During the trial Dr. Chappuis, a psychiatrist, testified that the defendant was a mental defective, a moron, poorly oriented as to time. Dr. Chappuis was of the opinion that the defendant could not aid in his defense.
The record before the trial court on the motion to appoint a lunacy commission includes numerous letters from the defendant's high school teachers and friends to the effect that he was "kind of weak minded" and a "little retarded." The correspondence reflects that Eddie Monroe was a slow learner who avoided socializing with other children. Dr. Chappuis stated in a letter written on June 6, 1963 to defendant's attorney that the prisoner's reference to voices that he heard for which he could not find the source constituted evidence of possible schizophrenic psychosis. Dr. Chappuis concluded that the defendant "suffers from a serious degree of mental illness and that psychosis cannot be ruled out without further examination." A lunacy commission should have been appointed.
For the reasons assigned, I respectfully dissent.
BARHAM, Justice (dissenting).
I am of the opinion that defendant's Bill of Exceptions No. 1 demonstrates reversible error on the part of the trial court. This bill was reserved when the trial court overruled defense counsel's objections to the admission into evidence of four confessions, two oral and two written, made by the defendant while in police custody. Defendant contends that the confessions should be ruled inadmissible because they were not freely and voluntarily given.
The standard by which the voluntary nature of these confessions must be judged is found in former R.S. 15:451 (Code of Criminal Procedure of 1928), which reads:
"Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
Also pertinent to a determination of the voluntary nature of the defendant's confessions is former R.S. 15:452, which reads:
"No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime."
In testifying on the predicate out of the presence of the jury, one of the police officers who effected defendant's arrest admitted he told the defendant that he would have to make a statement regarding the murder. While the record reveals that defendant was subsequently told by another police officer that he did not have to give a statement if he did not so desire, the record further reveals that the police officer who told the defendant that he had to talk remained in the interrogation room throughout the time the first statement was being taken.
*909 During the hearing out of the presence of the jury on the issue of the voluntary nature of the confessions the defendant took the stand and testified that at the time he made the first written statement to the police he believed he had to make the statement, as he was told, and believed the police might hurt him if he did not. The defendant also testified, and this testimony is not refuted, that he was made to sleep in an air-conditioned hallway on a concrete floor during these winter nights. During the course of his testimony, the defendant contended that the only reason he made the various statements was his fear.
In support of his contention that his motive for making the various statements was fear, and to traverse evidence presented by the State in an attempt to establish the voluntary nature of defendant's confessions, the defendant presented testimony of numerous witnesses out of the presence of the jury. Two of defendant's brothers testified that they were picked up by the police on the night preceding defendant's arrest, were held hostage until the defendant was arrested, and were brutally beaten with shotguns and fists during the period that they remained in police custody. Defendant's sister-in-law, the wife of one of the detained brothers, testified she had notified the defendant that his brothers were being detained by the police and were being subjected to physical violence. The sister-in-law further testified that she urged the defendant to give himself up for his brothers' sakes.
During the course of his testimony out of the presence of the jury, the defendant testified that, from his hiding place, he saw his brother, Louis, in the custody of the police. He further testified that at the time he saw his brother, Louis was crying. He confirmed that his sister-in-law later urged him to give himself up to the police.
To corroborate the story of Louis and Jimmy Monroe, the defendant presented testimony of a neighbor, Trotter Jordan, who witnessed a beating sustained by Jimmy Monroe at the hands of the police. There was absolutely no attempt by the State to rebut the testimony of defendant's witnesses to the effect that Louis and Jimmy Monroe were beaten and detained and that defendant was aware of this situation at the time he surrendered to the police.
In addition to the testimony noted above, Louis and Jimmy Monroe, Louise Monroe, Walter Monroe and Ruth Holmes (a friend of defendant who had arranged for his surrender to the police) testified that they made numerous attempts on each day of the week following defendant's arrest on Sunday to see defendant but were continually turned away by the police. This testimony was likewise unrefuted by the State.
Testimony given by one of the police officers on the predicate outside the jury's presence establishes that on March 5th, the day that defendant's two oral and second written statements were given, defendant was apprised of the fact that his first written statement and that of his co-defendant, Simmons, conflicted on the issue of who actually fired the gun and was told that the police would "* * * have to determine who was telling the truth. * * *" He was then taken to a location where polygraph tests were administered and there executed a written consent to the polygraph tests. The record reflects that the consent form contained numerous technical terms, difficult words which a defendant with an I.Q. between 55 and 65 quite probably could not comprehend (words whose meanings the defendant subsequently testified he did not know), and a "hold harmless" clause. Two polygraph tests were taken and, thereafter, the examiner called the two requesting officers, Drumm and Bourgeois, who were present when the defendant made an oral statement which apparently was based on the substance of his test responses regarding the offense. The defendant was thereafter taken to another location "upstairs", where the second written confession was taken. Shortly thereafter, another oral statement *910 was made. Only then did the defendant request use of the telephone, according to the officers. He was allowed to call his mother.
Given all of the circumstances related above, I am of the opinion that the State did not meet its burden of proving beyond a reasonable doubt that the legal requirements for voluntariness had been met. Testimony of a psychiatrist presented on defendant's behalf established that defendant was a 17 year old mental defective with an I.Q. of approximately 55 to 65. At the time his statements were made, he was surrounded by police officers, unassisted by counsel or relatives, under the impression that he had no choice about giving the statements and aware that his brothers (who, as far as the record reveals, had never been suspected of any involvement in the robbery-murder under investigation) had been detained and beaten by the police. I believe the uncontroverted evidence that defendant knew of the ill treatment of his brothers, combined with the other details brought out during the hearing on the voluntary nature of the defendant's confessions, shows that the State failed to meet its burden of proof. It appears to my satisfaction that the defendant's confessions were made as a result of his fear and the officers' misrepresentations that he had to make a statement.
Much of the testimony given by the defendant and his witnesses on the predicate, out of the presence of the jury, was totally unrefuted by the State. As stated above, the State failed to refute testimony concerning the treatment of defendant's two brothers at the hands of the police prior to defendant's arrest and the defendant's knowledge of this state of affairs. There was no refutation of the testimony concerning the police refusal of the right of visitation to defendant's many relatives and friends during the week following the arrest while the numerous confessions were being made. The State did not refute defendant's testimony that he was required to sleep on a concrete floor in an air-conditioned hallway on the winter nights subsequent to his arrest.
When a defendant takes the stand in an effort to traverse evidence presented by the State to establish the voluntary nature of his confessions, and presents testimony bearing on the issue of the voluntariness vel non of the confessions, the State is required to rebut defense testimony which would show that the confessions were not freely and voluntarily given. Failure of the State to present rebutting evidence must necessarily result in a finding that the State has failed to meet its burden of proof. See State v. Honeycutt, 216 La. 610, 44 So.2d 313 (1950) and State v. Simien, 248 La. 323, 178 So.2d 266 (1965). In State v. Douglas, 256 La. 186, 235 So.2d 563 (1970), this Court, in affirming that defendant's conviction and holding that the confessions given were not involuntary, stated:
"* * * Appellant was not held incommunicado; * * * There is no showing that he was denied access to his family * * *. Although he was young, an examination of his testimony exhibits that he was intelligent and precise as to time and dates, and we believe he was fully cognizant of all constitutional rights the law accorded him.
"A review of the evidence convinces us that appellant's confessions were not in anywise induced by threats, promises or physical or mental coercion."
Similarly, in State v. Vessel, 260 La. 301, 256 So.2d 96 (1971), the Court, in finding that the confession of a 17 year old accused was free and voluntary, stated:
"* * * No evidence shows prolonged and isolated questioning, such as would wear down the will of an accused of the defendant's youth.
"* * * he was not denied access to his family and their advice during this period. * * *
*911 "He is shown to possess an eighth grade education, to be able to read, and to be of normal intelligence. * * *"
As appears from the foregoing, and from a consideration of the discussion with regard to defendant's mental capacity, which follows, the factors which this Court has in the past deemed important in a determination of the issue of the voluntariness of a youthful defendant's confessions are simply not present here. This defendant established by unrefuted testimony that there did exist physical circumstances which produced fear and led to his confessions. He has likewise established that his family was denied the right to visit him and thereby assist him or advise him. He has established that he was required to endure physical discomfort during the days of his incarceration following his arrest. The cumulative effect of all of this evidence convinces me that the State has failed to establish beyond a reasonable doubt that the defendant freely and voluntarily gave these confessions.
I further believe that the trial court erred in prohibiting the introduction of evidence offered by the defense in order to show the defendant's fear which prompted the confessions (Bill of Exceptions No. 4).
After the State re-laid its predicate for the admission of defendant's confessions in the jury's presence, the defense attempted to re-present the same evidence it had adduced out of the jury's presence in an attempt to persuade the jury to give less weight to the confessions the State was about to present. The trial court refused to allow this testimony to be presented. The evidence sought to be elicited was the testimony of defendant's brothers, his sister-in-law, and Ruth Holmes, to the effect that defendant was overcome with fear at the time of his arrest because of the treatment his brothers had received at the hands of the police. Ruth Holmes testified out of the presence of the jury that a detective had urged her to tell where defendant was hiding because if the "blue coats" found him, they would shoot him down. Ruth Holmes testified that she then talked defendant into surrendering and that he stated at the time that he was afraid he would be shot.
While the admissibility of a confession is a matter for the court's decision, the defendant is entitled to present evidence before the jury which would go to the weight of the confessions. I believe there existed ample evidence that the causes for the fear defendant experienced at the time of his arrest continued up to and during the time the statements were taken. Hence, evidence of this fear would have supported an inference that the fear was continuous and would have been relevant to the issue of the voluntariness of the defendant's statements and the consequent weight the jury would wish to attach to these statements under the circumstances.
The trial court also erred, in my opinion, when it failed to appoint a lunacy commission to inquire into the defendant's sanity. The statutory law applicable at the time of this prosecution provided for a lunacy hearing:
"If before or during the trial the court has reasonable ground to believe that the defendant * * * is insane or mentally defective to the extent that the defendant is unable to understand the proceedings against him or to assist in his defense * * *." R.S. 15:267 (Code of Criminal Procedure of 1928).
Appended to defendant's application for a lunacy commission is a June 6, 1963 letter from a psychiatrist, Dr. Chappuis, who had examined the defendant. The letter states that the defendant suffered from a serious degree of mental illness. Dr. Chappuis' letter further noted a finding of possible schizophrenic psychosis, and stated that psychosis could not be ruled out without further examination. During his testimony on defendant's behalf at trial, Dr. Chappuis testified that the defendant was a mental defective and opined that the defendant could not assist in his defense.
*912 Confronted with this expert psychiatric opinion, I believe the trial court should have appointed a sanity commission and held a hearing. The failure to do so was gross error, in my opinion.
For the aforestated reasons, I respectfully dissent from the affirmance of this defendant's conviction and sentence.

ON REHEARING
TATE, Justice.
The defendant Monroe was convicted of murder in 1963 and sentenced to death. His death sentence was commuted to life imprisonment in 1973 and, later that year, he was granted an out-of-time appeal. On original hearing, we affirmed the conviction. We granted rehearing to reconsider our rulings on three bills of exceptions.
Bill No. 1:
This bill was taken to the admission into evidence of two written confessions and of two oral statements made by the defendant while in police custody after his arrest. The basis for the objections to their admission is, essentially, that the confessions were not free and voluntary but rather were the result of coercion and mistreatment, including physical mistreatment during prolonged and isolated questioning of this defendant, then aged 17 and of subnormal intelligence (between 55 and 65 IQ). We find merit to this contention.
The law in effect at the time of the trial (and at present) is set forth in La.R.S. 451 and 452 (1950). The former section provides: "Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." The latter section states: "No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime."
As noted on original hearing, citing State v. Skiffer, 253 La. 405, 218 So.2d 313 (1969), the state has the burden of proving, beyond a reasonable doubt, that the legal requirements for voluntariness have been met. See also State v. Savell, 238 La. 758, 116 So.2d 513 (1959) and the cases cited therein.
On our original hearing, we felt that the trial court's factual determination of a free and voluntary confession was entitled to great weight. As we noted, the trial court accepted the testimony of six police officers that, in their presence, no coercive threats or promises of immunity were made.
However, in affirming such trial court factual determination, we overlooked another long-settled principle of judicial review of such determinations with regard to the voluntariness of a confession of an arrestee while in police custody.
In view of the burden on the state in such circumstances to prove affirmatively beyond a reasonable doubt the voluntary nature of the confession, the state is required to rebut specific testimony introduced on behalf of the defendant concerning factual circumstances which indicates coercive measures or intimidation; it cannot simply rely on general testimony of officers not present that they witnessed no coercion, intimidation, or other undue influence. State v. Simien, 248 La. 323, 178 So.2d 266 (1965); State v. Honeycutt, 216 La. 610, 44 So.2d 313 (1950); State v. Robinson, 215 La. 974, 41 So.2d 848 (1949). In the absence of such rebuttal testimony, as the cited decisions hold, the state has not borne its burden of proof, and the appellate court must reverse.
In the present case, the testimony by the accused and by other of his witnesses shows coercive treatment outside of the presence of the officers who testified. No effort was made to rebut this testimony. Under the decisions noted, we must hold *913 that the state did not bear its burden of proving beyond a reasonable doubt the free and coercive nature of the written and oral confessions. We must therefore reverse.
The relevant facts include, as shown by uncontradicted testimony:
The crime was committed on the evening of March 1st. The defendant's companion, Simmons, was arrested the following day and confessed to the crime. He implicated the defendant Monroe as the triggerman. A manhunt utilizing the services of over one hundred police officers was then set in motion, combing the defendant's neighborhood to find him.
The defendant's two brothers were taken from their home at midnight that second day, March 2nd, and were brutally beaten with fists and a shotgun. They were held from midnight March 2nd until about 5:15 PM, March 3rd, until after the defendant gave himself up (partly at the urging of the wife of one brother, in order to save his brother from further beating). Prior to this, the beaten brothers were paraded through the neighborhood, crying and handcuffed, and from his hiding place the defendant so saw one of them.[1]
After his arrest, the defendant was taken to the Homicide Office in the Police Headquarters, where a partial confession (State Exhibit 34) was taken from him at about 6:40 PM, under conditions to be described more fully later. He was then moved to the Sixth Precinct Headquarters, away from his neighborhood, and held incommunicado for the next week. The attempts of his family to see him were denied. He was not permitted to call his mother until after he had given his second confession at 1:30 PM on March 5th, two days after his arrest, and after (at approximately the same time) he had made his two oral statements, all for the first time fully admitting his participation in the crime.
Prior to making these fully inculpatory statements, however, his uncontradicted testimony shows continued intimidation and physical mistreatment. His testimony stands unrefuted that, while at the Sixth Precinct, he was repeatedly threatened, that he was made to sleep on the floor with air conditioning turned on (in winter weather), and that he was denied his repeated requests to contact his family. (His family's testimony is also undenied that they repeatedly sought at the police station to talk with him and that they sent him in nickels for him to call them.)
The homicide division officers and the arresting officers (from the emergency division) all testified that, in their presence, no coercive measures took place. However, no Sixth Precinct officers rebutted the testimony of mistreatment there. Other circumstances (see the dissenting opinions on first hearing) also affirmatively indicate the non-voluntariness of the confessions. The state itself does not deny holding this 17 year-old borderline mental defective incommunicado for these two days, despite efforts of his family to be with him during this interval.
The state further fully admits that it did not inform him of any right to counsel or of any other constitutional rights during these two days, simply contending that, this being pre-Escobedo and pre-Miranda, it was not constitutionally required to do so.
Nevertheless, under the circumstances of the unrebutted showing, the state clearly has not borne its burden of proving that the written confession of March 5th, and the two oral statements made on that day, were voluntarily made and uninfluenced by intimidation, fear, threats, or physical or mental maltreatment. See La.R.S. 15:451, 452 (1950). See State v. Simien, 248 La. 323, 178 So.2d 266 (1965) (syllabus 3) for reversal for insufficient proof of *914 voluntariness of confession under somewhat similar circumstances.
A closer issue is presented as to the admissibility of Monroe's first written confession, taken between 6:40 and 7:40 PM on the evening of March 3rd. See Tr. 597-628.
Monroe had been arrested from under his uncle's house at about 5:15 P.M. He was immediately taken to the neighborhood command post of the manhunt for him, in which over one hundred police officers participated. The superintendent of police directed that Monroe then be taken to the Third District Police Headquarters.
The van in which he sat handcuffed was then escorted by six motorcycle police officers to Third District Police Headquarters. While waiting there, one of the arresting police officers admitted that he informed the arrestee: "I told him he would have to make a statement to the effect of the murder." Tr. 604.
The captain in charge of the homicide division then came. Monroe was taken by the captain, followed by the three police officers, down to the Homicide Division of Police Headquarters. He there docily and without request for any counsel or relative signed a partial confession.[2]
The confession was executed with five armed police officers present and standing around. One of the arresting police officers had told him he had to make a statement concerning the murder. (However, the police captain testified that, after Monroe agreed to make a statement, he told this 17-year-old mentally defective arrestee twice, once at the Third District and once at Headquarters, that he was not obliged to make it.)
All officers admitted that the defendant was not informed of his right to counsel, or (other than the offhand suggestion, made only on defense counsel's cross-examination, that the captain had told the arrestee he really did not have to make the statement) of any other of his rights. No effort was made to let Monroe's uncle (who had gone with the police to help in the arrest), or any other adult of his family, consult with him prior to his being questioned.
The policemen testified that, after the arrest, no threats or promises were made to induce the confession. We accept their testimony as true. Even accepting it, however, in view of the shown circumstances of this caseof uncontradicted testimony of the beating of his brothers and of Monroe's knowledge thereof prior to his own arrest (he testified as to this and as to his own fear of being beaten like them if he did not comply with their request for a statement), of the circumstances of the overwhelming police presence, and of the youth and mental insufficiency of the defendant; and of the complete absence of any attempt to assure the defendant of information of his right to counsel and fuller information as to his right to remain silent or even to let him consult with his family prior to questioning, the state did not prove beyond a reasonable doubt, as required for decades by our state constitution and statutes, that even this initial confession of March 3rd was free and voluntary and not made under the influence of fear or intimidation.
The state thus did not prove that the written confessions and oral statements were voluntarily made and not the product of coercion and fear. The trial court therefore erred in admitting them into evidence. The conviction must, therefore, be reversed.
Bill No. 2:
The defendant was jointly tried with his co-defendant Simmons, his companion *915 at the time of the crime. Over the defendant's objections, Simmons' confessions implicating the defendant were admitted into evidence. Simmons did not himself take the stand.
The objection to the admission of Simmons' confessions is based upon Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968). These held that, in state and federal prosecutions, the admission into evidence over objection of the confession of a co-defendant or other person who implicates a defendant in the crime deprives a defendant of his confrontation rights guaranteed by the Sixth Amendment of the United States Constitution, when such other individual does not himself take the stand and subject himself to cross-examination.
On our first hearing we held this error to be harmless: Simmons' confessions of the defendant Monroe's full participation in the crime were substantially the same as the defendant's second confessions made two days after his arrest. See: Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); State v. Hopper, 253 La. 439, 218 So.2d 551 (1969).
In concluding that, for this reason, this substantial violation of a constitutional right was harmless, we overlooked that the admission of the Simmons' confessions destroyed the defendant Monroe's potential defense, based on his first confession, that his companion Simmons committed the crime without his own foreknowledge that a crime was intended. See Footnote 2 above. By corroborating the defendants' second confession (made, as previously noted, after two days of physical and mental abuse, and for the first time, admitting premeditated participation with Simmons in the crime), the Simmons' confessions also tended to destroy Monroe's defense that his own second confessions were the product of two days of intimidation (as we now hold they in fact were), especially since (Monroe argued) so much more incriminating than his initial confession made right after his arrest two days earlier.
Bill No. 2, therefore, also has merit.
Bill No. 7:
This bill was perfected to the denial of the defendant's motions for appointment of a lunacy commission to determine whether he was insane at the time of the trial, and also whether his mental condition was so defective that he was unable to assist his counsel in the defense of the charge against him.
The statute applicable at the time of the trial, La.R.S. 15:267 (1950), provided: "If before or during the trial the court has reasonable ground to believe that the defendant, against whom an indictment has been found or information filed, is insane, or mentally defective, to the extent that he or she is unable to understand the proceedings against him or her or to assist in his or her defense, the court shall immediately fix a time for a hearing to determine the defendant's mental condition * * *." (Italics ours.) La.R.S. 15:268 (1950) also provided that the court "may" appoint a lunacy commission when the existence of insanity or a mental defect at the time of the crime becomes an issue.
Attached to the bill of exceptions was a psychiatric report showing the defendant to have an IQ of between 55-65 and also expressing the opinion that there was evidence of schizophrenic psychosis and that the defendant suffered from a serious degree of mental illness. In addition, other letters and an official school record attached to the bill stated that Monroe was weak-minded, slightly insane, and sociopathic.
On our original opinion, we essentially held that we could not state the trial court erred because the evidence at the pretrial hearing (at which these writings has been admitted) was not attached to the bill.
*916 The bill of exception was perfected in 1973 by court-appointed counsel, after an out-of-time appeal to the 1963 conviction was ordered due to default on the part of 1963 counsel, now deceased. Under the circumstances, the defendant should not be denied review because of the now-unavailability of the full evidence taken at the 1963 hearing on the motion for a lunacy commission, shown by the minutes to have been held. This is especially true since the testimony of the psychiatrist who testified at the lunacy commission hearing (according to the minute entry) is present in the record as part of the trial on the merits (in support of the defendant's plea of not guilty by reason of insanity).
The uncontradicted opinion of this psychiatrist is that the defendant is a mental defective who could not aid in his defense, and that he has a limited contact with reality and a limited ability to distinguish between right and wrong. The psychiatrist was of the opinion that this mental condition had existed since birth. The lay evidence at the trial, as well as the letters attached to the bill of exceptions, all seem to corroborate this opinion.
The trial court committed error, in the fact of this showing, in failing to appoint a lunacy commission to determine the defendant's mental capacity to assist his counsel in the defense of this then-capital charge against him.[3]
Decree
For the reasons assigned, the conviction and sentence are annulled, and this case is remanded to the district court for a new trial in accordance with law.
Reversed and remanded.
SANDERS, C. J., dissents adhering to the views expressed on original hearing.
SUMMERS, J., dissents and adheres to our original opinion.
MARCUS, J., dissents and adheres to original opinion.
NOTES
[1] The dissenting opinion, on first hearing, of Mr. Justice Barham sets out this uncontradicted evidence at greater length.
[2] The effect of this confession was to claim that his co-defendant shot and killed the victim while he was waiting in a car, without his own foreknowledge that a crime was to be committed. However, he admitted accepting from his companion some of the proceeds of the victim's purse and helping him to paint (disguise) the automobile used in the crime.
[3] Under our ruling and the evidence shown, on the remand the denial of motions for the lunacy commission to determine the insanity at the time of the offense may, of course, be reconsidered.