363 So.2d 684 (1978)
STATE of Louisiana
v.
William S. JOHNSON.
No. 62387.
Supreme Court of Louisiana.
October 9, 1978.
Rehearing Denied November 9, 1978.
*685 Michael S. Fawer, New Orleans, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Dennis J. Waldron, Nicholas F. Noriea, Jr., Asst. Dist. Attys., for plaintiff-respondent.
DIXON, Justice.
Defendant was indicted for first degree murder. This matter comes to us on writs after the district court denied defendant's motion to suppress the confession.
During the early part of the evening of January 16, 1978 a young man rang the doorbell at the Washington Avenue residence of Dr. and Mrs. Thomas Crumpler in Orleans Parish. When the door was opened the assailant shot both Dr. and Mrs. Crumpler, seriously injuring him and killing Mrs. Crumpler. On January 17, 1978 William S. Johnson, Mrs. Crumpler's son, was interviewed by members of the New Orleans Police Department concerning his activities the previous evening. During the interview at Johnson's grandmother's house on Philip Street, where Johnson had an apartment, the officers questioned Johnson about one Kevin Seward. At first the defendant stated that he did not know anyone named Seward, but after some time he went upstairs and returned with Seward who had been staying at the Philip Street residence for several days. After an interview the officers departed.
At about 10:30 p. m. the next evening, January 18, 1978, the police phoned Johnson to find out whether he and Seward would be at home that evening for further questioning. Johnson replied that both men would be at home all evening. However, when the police arrived at 11:30 p. m. they arrested Johnson and charged him with "harboring a fugitive" and with being an "accessory to murder." Seward, who was in bed, was roused and arrested, and both men were taken to police headquarters for interrogation by the homicide unit. During the course of interrogation defendant confessed to the murder of his mothera confession admittedly false in its principal details.
On January 26, 1978 defendant was indicted by the Orleans Parish Grand Jury on charges of first degree murder (R.S. 14:30). Mr. Johnson through counsel thereafter filed a motion to suppress the confession on the ground that the confession had not been given freely and voluntarily and that the *686 confession was the fruit of an illegal arrest. After a denial of his motion on May 30, 1978, defendant sought and was granted a writ of certiorari from this court to review the ruling of the district court. 360 So.2d 201 (La.1978).

Assignment of Error No. 1
Defendant alleges that the district court committed reversible error by not granting his motion to suppress because the State failed to meet its burden of proving beyond a reasonable doubt the free and voluntary nature of defendant's statements made while in custody.
R.S. 15:451 provides: "Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises." This statute has been interpreted to require the State to prove the voluntary nature of the confession beyond a reasonable doubt. State v. Hills, 354 So.2d 186 (La.1977), State v. Glover, 343 So.2d 118 (La.1977). The State is also required by the jurisprudence to rebut specific testimony introduced on the defendant's behalf which indicates coercive measures or intimidation and cannot rely merely on general testimony of officers not present that they did not witness any coercion, intimidation or other undue influence. State v. Hills, supra, State v. Monroe, 305 So.2d 902 (La.1974).
Defendant argues that his confession is inadmissible because it resulted from fear that he would be beaten as he alleges Kevin Seward was, or that Seward would be beaten more severely. Fear that police will inflict additional harm on another has been recognized as a substantial factor in determining the voluntary nature of the confession. State v. Monroe, supra (on rehearing). The inquiry therefore must focus on two points: whether Kevin Seward was in fact beaten by members of the homicide unit; and whether the defendant actually believed that further beatings, whether to be inflicted upon himself or upon Kevin Seward, would result from his failure to confess.
After their arrest, Johnson and Seward were taken to the police station where Seward was interrogated from shortly after midnight until about 2:00 a. m. Seward's questioning was conducted in a small room at one end of a large hall while Johnson was placed in a holding cell at the other end. At approximately 2:00 a. m. the roles were reversed and the defendant was interrogated by the homicide unit.
Seward remained in the custody of the homicide unit from the time of his arrest until 2:30 p. m. the following day. Upon being transferred to Central Lockup he complained of chest pains to the booking clerk, but explained that they resulted from a fall down some stairs prior to his arrest. Later Seward again complained of pain and requested to see a doctor. On this occasion Seward told the watch commander of Central Lockup that his injuries resulted from a fall from a porch.
As a result of his request Seward was taken to Charity Hospital by two officers from the homicide division. In their presence he informed the treating physician, Dr. Pike, that he had been injured in a fall down stairs, but when the officers left he whispered to the doctor that his injuries were a result of police beatings and that he was telling him this to receive correct treatment. Seward also told the doctor that he was afraid for the record to reflect the true cause of his injuries for fear of further beatings. At the hearing on the motion to suppress Dr. Pike testified that Seward was suffering from a swelling on the head and from patches of bruises which covered his back. The doctor also noted that a costovertebral-angle test had shown some kidney injury (although urinalysis revealed no blood) and that Seward was suffering chest wall ache. These symptoms were, according to Dr. Pike, consistent with a severe beating or with a fall down stairs, albeit a rather spectacular one. The doctor dated the injuries as having occurred within a time range of eight to twenty-four hours before his examination, between 5:30 p. m. *687 of January 18, 1978 and 9:30 a. m., January 19, 1978.
Defense counsel argues in brief that the State's own witnesses have inadvertently precluded Seward's being injured prior to his arrest because the arresting officers testified that they observed no bruises on Seward's body at the time of his arrest when he was wearing only undershorts. However, one officer testified that he might not have observed any bruises because the room was dimly lighted, a statement controverted by defendant. All the arresting and interrogating officers testified that Seward and Johnson were not beaten, tricked, intimidated or threatened in their presence.
Even if Seward was beaten by the police, the confession of the defendant is to be excluded from evidence only if he was fearful as a result of Seward's being beaten and confessed to avoid similar treatment for himself or even harsher treatment for Seward. At the time Seward was interrogated, Johnson was confined in a holding cell at a distance of between forty and sixty feet. Although Johnson testified that he could hear Seward's shouts and the policemen's threats and curses, two officers who questioned Seward denied that Seward cried out and furthermore stated that they had conducted the interrogation quietly, raising their voices only occasionally. Defendant also testified that he was told by the interrogating officers that he would not be marked but that they were willing to hurt Seward and even kill him if the defendant did not confess. Moreover, the officers allegedly slapped the defendant when he responded incorrectly to their questions.
The interrogating officers both testified that defendant had communicated his fears of being beaten, but had not mentioned Seward. One of the officers testified that he told Johnson that he would not be beaten and that Johnson subsequently confessed, after discussing his rights and signing a second "rights of the arrestee" form. The other officer stated that defendant was advised of his rights after he related his fears of being beaten and that he confessed soon afterward.
The police testimony contradicted all the testimony of Seward and Johnson. If we disbelieve all the testimony of Seward and Johnson and believe the testimony of the police, Seward must have been beaten a few hours before his arrest. On the record before us, it is difficult to conclude that all the police were lying, and it is not difficult to believe Seward and Johnson were lying. Therefore we cannot say the trial judge was in error in finding that the confession was freely and voluntarily made.
The assignment is without merit.

Assignment of Error No. 2
Defendant contends that his confession is the fruit of an illegal arrest, since there was no probable cause to arrest him on January 18, 1978.
Although mere suspicion cannot justify an arrest, State v. Thomas, 349 So.2d 270 (La.1977), the officer does not need sufficient proof to convict, State v. Randolph, 337 So.2d 498 (La.1976). Article 213 of the Code of Criminal Procedure permits an officer to arrest a person without a warrant when ". . . (3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer." The meaning to be given this provision has frequently been expressed:
". . . Reasonable cause, which we have treated under this article as consonant with the probable cause concept, exists when the facts and circumstances known to the arresting officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. . . ." State v. Drew, 360 So.2d 500, 510 (La.1978).
See also State v. Dunbar, 356 So.2d 956 (La.1978), State v. Smith, 352 So.2d 216 (La.1977).
When asked on the motion to suppress what probable cause there was to arrest William Johnson, one of the detectives answered, "Just that the circumstances surrounding *688 my investigation indicated to me that Mr. Johnson was involved in the death of his mother and that the motivation behind Mr. Seward's act was Mr. Johnson."
Johnson himself admitted that he was a "prime suspect" in the murder of his mother. Nancy Crumpler was killed about 6:30 on the evening of January 16, 1978. On that evening, around 8:45, India Bradley, William Johnson's cousin and granddaughter of Kitty Morris, arrived at Kitty Morris' residence at 1430 Philip Street bearing news of the tragedy. Kitty Morris was a eighty-nine old semi-invalid in whose house William Johnson had lived for several years in an upstairs apartment. India Bradley, in the presence of Kevin Seward, told William Johnson that his mother was dead. Johnson's reaction to the news was a manic performance in which he expressed his delight. He offered some pills of some sort to Seward (who appeared to be under the influence of narcotics) telling Seward that he "deserved" some. Johnson danced around crying, "I'm glad the bitch is dead." Seward's long hair was dry on top but wet on the ends, as if he had been out in the rain with a hat on. This information was given to the police the next day. They learned that Seward had been employed for a short time at The Bistro, and obtained a picture of him which was reproduced and shown along with other police pictures to Dr. Crumpler and a Mrs. Jones. Dr. Crumpler selected Seward's picture as being more nearly like that of his assailant than any of the others. Mrs. Jones made a more positive identification of Seward as the person she saw in the street near the Crumpler residence at about the time of the killing. The police also knew that the nature of the killing more nearly resembled a crime of passion, arising from revenge or hatred, than a crime connected with robbery or burglary. The assassin first short Dr. Crumpler, who opened the door and stood in the way, then chased and shot Mrs. Crumpler twice in the back, finally placing the gun near her head and firing a shot, as if to make certain of her death.
With this information, the police visited the Morris residence on Philip Street on the evening of January 17. There they questioned William Johnson who told them that between 6:30 and 7:00 p. m. on January 16 he was watching television with his grandmother, who verified defendant's whereabouts. He also told the police that a friend of his named Kevin had come to the house at ten minutes to seven. Johnson said he asked Kevin to go to a nearby drug store for him. Upon being questioned about Kevin, Johnson denied knowledge of his whereabouts and denied that he knew Kevin's last name. After considerable conversation Johnson admitted to the police that Seward was upstairs. He then went upstairs and brought Seward to the police to be interviewed by the officers.
The police were impressed with the hair of both Johnson and Seward. They expected to see long hair but instead both men had obviously fresh haircuts, and the hair was relatively short.
At this visit, the police discussed with Johnson his attitude toward his mother. He readily admitted his hatred for her, a situation which had existed for many years while Johnson lived in his grandmother's house. Police learned from Seward that he had arrived in town from Maine about the end of October and had "made his living by hustling homosexuals in the French Quarter." Seward had no identification, having had his wallet stolen the preceding day. At the time of the murder Seward said he was somewhere in the French Quarter drinkinghe didn't know where. Johnson said he had met Seward in the French Quarter a few weeks before and that Seward was a frequent visitor. Seward was at the time staying in a room in Johnson's apartment because he had no other place to stay, and no money.
Later in the evening of January 18 the police called Johnson. They told him they wished to speak to him again. When the police arrived about 11:35 p. m. January 18 they were admitted by Mrs. Morris' maid. They went immediately upstairs and arrested Seward and Johnson.
*689 Seward had been identified as the probable killer, and had been placed in the neighborhood of the murder shortly after it occurred. Seward's own story did not account for his whereabouts at the time of the murder. Johnson lied about Seward's whereabouts on January 17, which at least indicated Johnson's reluctance for the police to find the male prostitute in Johnson's apartment.
Johnson's hatred of his mother provided a motive for her murder. The information the police had indicated that Johnson did not pull the trigger, but that Seward probably did. Nothing in the investigation developed a reason for Seward to kill Mrs. Crumpler, except to please Johnson. Seward was impecunious and Johnson had the appearance of relative economic comfort. It is admittedly an intellectual jump to say, at this point, that Johnson arranged for Seward to kill his mother. However, from what the police could see about the unnatural filial hatred and the irrational conduct of Johnson, and from the character of the male prostitute with whom he was living, we cannot say there was no probable cause to arrest Johnson for complicity in the murder of his mother.
One of the most important elements in determining whether probable cause existed is satisfied when the police know a crime has actually been committed. When a crime has been committed and the police know it, they only have to determine whether there is reasonably trustworthy information to justify a man of ordinary caution in believing the person to be arrested has committed the crime. In many cases the police do not know that a crime has been committed. When the arrest or search is made when the police do not know that a crime has been committed, more and better evidence is needed to prove that probable cause exists for the arrest than is the case when the police know a crime has been committed.
Here the police knew of the murder; they did not have actual knowledge of the criminal complicity of Johnson. The facts known to the police in this case would have justified a man of ordinary caution to believe that Johnson was guilty of criminal complicity in the murder of his mother.
It is not important that the police said they arrested Johnson for "harboring a fugitive." There was reason for the police to believe that Johnson knew Seward had killed Mrs. Crumpler on January 16, but nevertheless kept Seward in a room in his apartment and participated with him in altering his appearance. The police had reasonable grounds to believe that Seward had committed the murder, and they also had reasonable grounds to believe that Johnsom, "knowing or having reasonable ground to believe that he (Seward) has committed the felony," aided Seward, with the intent that Seward might escape punishment.
"Accessory after the fact" is defined:
"An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment." R.S. 14:25.
The reporter's comment to R.S. 14:25 states:
". . . This corresponds to the common law and usual statutory definition of accessories after the fact except in one particular. While the common law rule required actual knowledge that the person aided had committed a felony, the definition adopted makes it sufficient that the accessory after the fact knew or had `reasonable ground to believe' that the one assisted had committed a felony. Proof of actual knowledge is sometimes very difficult; and the really innocent accomplice after the fact will be protected by the concluding requirement that the assistance must be rendered `with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.' Generally speaking, virtually any sort of aid given to a fugitive felon, to hinder his being arrested, tried or punished, will make the person assisting an accessory after the factas furnishing a car, food, *690 shelter or money to help him escape or elude the lawful authorities, or using force or threats to rescue or protect him.. . ."
This is not to say that Johnson was guilty as an accessory beyond a reasonable doubt (see State v. Jackson, 344 So.2d 961 (La.1977)), but we find the police had probable cause to arrest him.
There is no merit to this assignment.
The ruling of the trial judge on the motion to suppress is affirmed, and the case is remanded to the trial court for further proceedings.
TATE, J., concurs in part and dissents in part.
DENNIS, J., concurs, finding that the officer had probable cause to arrest defendant as an accessory after the fact.
TATE, Justice (concurring in part, dissenting part).
I concur in the majority determination that the accused Johnson's arrest was sufficiently based on probable cause to be valid, so that therefore his confession should not be excluded as resulting from the exploitation of an illegal arrest.
I dissent, however, insofar as we hold his (false) confession was voluntary. The strong independent medical evidence that Seward was beaten, and the circumstances of Johnson's confession (including his knowledge and hearing of the beating of Seward; as well as his confession's falsity) indicate to me that neither confession was freely and voluntarily made.

ON DENIAL OF REHEARING
PER CURIAM.
Kevin Seward, who along with defendant William S. Johnson is accused of the murder of Johnson's mother, is not a party to these proceedings. Nonetheless he has applied to a rehearing. He seeks, in the alternative, deletion of language which appears in our opinion on original hearing (". . . it is not difficult to believe Seward and Johnson were lying.") contending that Seward's substantive rights are adversely affected by this "determination" (that he may have lied about having been beaten by the police). Notwithstanding that Seward is without a right to seek modification of a judgment in a matter to which he is not a party, we note that this "determination" concerning Seward's veracity, if it can loosely be called that, in the Johnson case here under consideration, does not and can not adversely affect or resolve Seward's rights. Should Seward hereafter find himself attacking a ruling on his confession's admissibility, our determination then will be unaffected by any determination made in connection with this pre-trial review of the ruling on Johnson's motion to suppress his confession.
With these observations Seward's application for rehearing is denied.