509 So.2d 413 (1987)
STATE of Louisiana
v.
Kevin SEWARD.
No. 86-KA-0683.
Supreme Court of Louisiana.
June 22, 1987.
Rehearing Denied September 3, 1987.
William Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Mike McMahon, Terry Boudreaux, Asst. Dist. Attys., for plaintiff-appellee.
Dwight M. Doskey, Orleans Indigent Defender Program, Elizabeth Cole, New Orleans, Tulane Law School Clinic, Renee Newman, for defendant-appellant.
CALOGERO, Justice.
This prosecution arose out of the murder of Nancy Morris Crumpler on January 16, 1978. Kevin Seward and a co-defendant, *414 William S. Johnson, were jointly indicted by an Orleans Parish Grand Jury for the murder of Mrs. Crumpler, the mother of co-defendant Johnson. The case is before us on Seward's appeal; his principal contention is that his confession was not freely and voluntarily given. According to Seward, his confession was obtained only after he was beaten by the police. It should, therefore, not have been admitted at trial, he contends.
Both Seward and Johnson, through counsel, filed pre-trial motions to suppress their confessions. The hearing on the motions took place before Judge Matthew Braniff of Section B of the Criminal District Court for the Parish of Orleans. On May 30, 1978, the motions were denied.
Evidently, either or both defense lawyers filed a motion to sever prosecution of the two cases. That motion to sever was apparently granted.[1] Johnson alone then filed pre-trial writs in this Court, contending that his confession was inadmissible because it resulted from fear that he would be beaten, as he alleged Seward was, or that Seward would be beaten more severely. Addressing Johnson's attempt to suppress his confession, we affirmed the trial court's denial of the motion to suppress, ultimately holding that "[e]ven if Seward was beaten by the police," Johnson's confession had still been voluntary. State v. Johnson, 363 So.2d 684, 687 (La.1978). In a per curiam appendage to that decision, prompted by an amicus application for rehearing filed by this defendant, Seward, who was not a party to the Johnson appeal, we noted that our observation concerning the possibility Seward was lying would have no application to Seward, should Seward choose to attack a ruling on his confession's admissibility. Id. at 690. Johnson was ultimately convicted of first degree murder and sentenced to life imprisonment at hard labor. The conviction and sentence were affirmed by this Court. State v. Johnson, 438 So.2d 1091 (La.1983).
Seward, aided by new trial counsel,[2] apparently filed pre-trial a second motion to suppress his confession after the original prosecution of Seward and Johnson had been severed and Seward's case had been realloted to Section F of the Criminal District Court for the Parish of Orleans. The hearing on this motion took place on February 12, 13, and 14, 1979, before Judge Oliver Schulingkamp. On March 2, 1979, this motion was also denied. Seward, unlike Johnson, did not seek writs in this Court to review the suppression ruling before trial.
Seward's trial commenced on March 12, 1979. His confession was introduced at trial, over objection of defense counsel. On March 14, 1979, the jury unanimously found Seward guilty of first degree murder. After a sentencing hearing, the jury recommended that Seward be sentenced to life, rather than executed. On March 23, 1979, Seward was sentenced to life imprisonment at hard labor.
For unexplained reasons, an appeal from the conviction and sentence did not reach this Court until 1986.[3] When it did, defense counsel requested in brief only that this Court review the trial transcript for patent errors. When Seward complained about the treatment given his case in that brief, and about the circumstances surrounding his confession, we removed Seward's case from the summary docket and appointed the Tulane Law Clinic for rebriefing and argument on Seward's behalf.
We now find that the State did not meet its burden of proving, beyond a reasonable doubt, that Seward's confession was freely and voluntarily given. We further hold that the trial court's error in admitting the confession cannot be deemed harmless.
*415 Accordingly, we vacate Seward's conviction and remand this case for a new trial.

Facts
Seward and Johnson were arrested for the murder of Mrs. Crumpler[4] at approximately 11:30 p.m. on Wednesday, January 18, 1978, at the residence they shared on Philip Street in New Orleans. The arresting officers[5] indicated that Seward was found sleeping in bed, clad only in his underwear. None of the arresting officers noted any bruises, marks or objective signs of injury on Seward when he was arrested, although they had ample opportunity to have done so. They handcuffed him upon arrest.
Both men were taken to the New Orleans Police Department's Detective Bureau for separate interrogations. Seward was interrogated from midnight until 2:00 a.m. He contends that during this time the police, in an effort to procure his confession, repeatedly hit him in the head, kicked and hit him in the chest and back, pushed him to the floor, and placed a plastic bag over his head. The officers also allegedly threatened, swore and screamed at Seward in an effort to elicit a confession.[6] The confession ultimately elicited was, according to Seward, a direct result of the foregoing police misconduct.
The police version of the facts leading to the confession was different. According to the police, Seward was initially interrogated for approximately two hours. No confession was obtained at that time. Seward was then placed in the holding cell Johnson had occupied, while Johnson was brought into the interrogation room. Johnson then allegedly confessed to the crime and implicated someone other than Seward. Seward was then informed he was free to leave.
However, the police then asked that he remain at the station until they had picked up the person whom Johnson had implicated. At that point, Seward, wishing to have his name cleared, obliged the officers and thereupon crawled up on one of the desks in the Detective Bureau and went to sleep.[7]
After investigating Johnson's story, and finding it not believable, Detectives Dillman and Norwood returned at 7:00 a.m. and found Seward still asleep. Seward was then roused by the officers, who asked that he take a polygraph examination. Seward agreed.
At approximately 9:30 a.m., the polygraph operator testified, Seward made a statement implicating himself and Johnson. This information was relayed to Detective Dillman. Seward then reiterated the same story to Dillman. Dillman, together with Detective Steve London, then procured Seward's written confession. The officers testified unequivocally and uniformly that they had at no time used any physical or mental force or coercion in order to obtain Seward's confession.
At that point, Seward was transported to Central Lock-up, where he was booked with the murder of Mrs. Crumpler. He was booked by Ms. Edwina Penn, a Correctional Officer employed by the New Orleans Police Department. During the booking process, Penn asked Seward if he had injured himself. Seward answered in the affirmative, stating that he had bruised his chest in a fall prior to his arrest. Penn testified that when she asked Seward if he was injured, it took Seward quite some time to answer. In conjunction with this testimony, Seward testified that he made up the story out of fear of police retaliation. Since Penn was also a New Orleans *416 police officer, it made little sense to Seward to inform another New Orleans police officer that he had been beaten, according to Seward. Further, Seward had purportedly been slapped and threatened by Detective Fred Hoyt that more beatings would be forthcoming if he informed anyone of the prior beatings.[8]
After Seward informed Penn of his injuries, Penn informed her superior, Officer George Delpedio, Jr., that Seward had complained of an injury and wanted to be taken to a hospital. Upon lifting up Seward's shirt, Delpidio noticed a bruise on Seward's chest area. Seward purportedly informed Delpedio that he had fallen off a porch prior to his arrest. Delpedio called the homicide unit. When homicide officers Hoyt and Dantagna picked Seward up and transported him to Charity Hospital, it was approximately 5:00 p.m. on January 19, 1978, some eighteen hours after Seward's arrest and seventeen hours after the police had first started interrogating Seward.
At Charity, Seward was examined by Dr. Robert Pike. At the time of the examination, Dr. Pike was interning in the emergency room of Charity Hospital.[9] According to Dr. Pike, Seward initially told him that he had sustained his injuries in a fall down some stairs. However, about three or four minutes into the examination, Seward changed his story (after the homicide detectives were out of earshot) and informed the doctor that he had sustained his injuries by a police beating.
Dr. Pike testified that he was asked by Seward not to tell the police what Seward had just told him for fear that further beatings might result and that he, Dr. Pike, respected his patient's wishes not to tell the police or to put the information in his hospital report because of his patient's request for confidentiality. During his examination, Dr. Pike discovered three or four bruises ("purpura"), profuse over his patient's back, possible injuries to the kidneys, a swollen area on the left side of his head which measured in length from 3 to 4 centimeters, a big bruise over his breast bone, and a tenderness in his right knee, but no internal bleeding. The doctor had X-rays taken, and they were negative for fractures. A urinalysis performed by Charity was also negative.
Dr. Pike could not pinpoint the time of the injuries with any amount of definiteness. The injuries were consistent with a beating, or a major fall, according to Dr. Pike.
When queried as to the type of fall necessary to produce injuries as extensive as those suffered by the defendant, Dr. Pike stated:
[H]e could have fallen down a flight of stairs that ended at a landing, and then, fell down another flight. He could have fallen down on his back, and sustained the purpura to his back against the edge of the stairs for, say, one row, flipped and fell down forward another....
* * * * * *
He could have flipped in midfall down the staircase, and fell on his chest sustaining the injuries to his sternum. The sternum is the most prominent part of the chest, and that's what would hit the stair slats going down. He could have hit his head on the left side going down.
Defense counsel also adduced testimony from co-defendant Johnson concerning the types of steps found in the home where defendant and his co-defendant resided:
There are about six steps to go up to a landing, and then, about twenty more to go to the top. About three years ago, I had the entireafter my grandmother's *417 fall, I had the entire downstairs and the staircase recarpeted in what's called ... geriatric weight carpet.... First class nursing homes use this, so that, when geriatric patients slip and fall, they won't hurt themselves. However, on the staircase, I had a double carpet put down. In other words, it's not only a geriatric's weight, there are two pads and two carpets. I slid down that staircase myself, and it's like sliding down a mattress.
Additionally, one of the arresting detectives testified about the staircase in Johnson's home:
To the best of my recollection, they had some type of padding on it, either a rubber type or nonskid type, or they were carpeted.
Before a defendant's confession may be introduced into evidence, the state must affirmatively show that the confession was offered freely and voluntarily and was not given under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La.Rev.Stat.Ann. 15:451 (West 1981). This statute serves to safeguard a defendant's fifth amendment protection against self-incrimination. State v. Coleman, 390 So.2d 865 (La.1980). Further, admission of a coerced confession serves to deny a defendant due process of law, in violation of the fourteenth amendment to the United States Constitution. Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958). The constitutional guarantee of due process is denied an accused when he is deprived of that "fundamental fairness essential to the very concept of justice." 356 U.S. at 567, 78 S.Ct. at 850, 2 L.Ed.2d at 981 (citations omitted).
Although the burden of proof is generally on the defendant to prove the grounds recited in a motion to suppress evidence, such is not the case with the motion to suppress a confession. In the latter situation, the burden of proof is with the state to prove the confession's admissibility. La.Code Crim.Proc. art. 703(D) (West 1981). Acknowledging the affirmative duty placed on the state to prove a confession's admissibility, we have held that the state must prove "beyond a reasonable doubt" that the confession was made freely and voluntarily. State v. Smith, 409 So.2d 271 (La.1982). The "beyond a reasonable doubt" burden insures that the state cannot obtain a verdict against a criminal defendant "without convincing a proper factfinder of his guilt with utmost certainty." In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Winship, the United States Supreme Court recognized the reasonable doubt standard as "impress[ing] on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue." 397 U.S. at 364, 90 S.Ct. at 1072, 25 L.Ed.2d at 375 (citation omitted). As applied to the situation before us, the evidence presented by the state must persuade a rational trier of fact "beyond a reasonable doubt" that the defendant sustained his injuries from a fall, rather than by a beating from the police. Our review of the record in this case indicates that the lower court was simply wrong in finding that the state met that burden of proof.
Doubt concerning the cause of Seward's injuries arises from the following factors gleaned from the motions to suppress and the evidence introduced thereon:
a) An independent medical witness, Dr. Robert Pike, testified that Seward's injuries were consistent with a beating.
b) Although Dr. Pike also testified Seward's injuries could have been sustained in a fall, Pike's description of the type of fall necessary to elicit such injuries indicated the fall had to be a rather spectacular, and perhaps, unusual one.
c) There is no evidence that Seward sustained such a fall, other than Seward's admission to such fact, made to two police officers at Central Lock-up, and his admission to Dr. Pike in the presence of Detectives Hoyt and Dantagna, who had participated in the arrest of Seward. (Seward contended Detective Hoyt also participated in the beatings.) Further, at the first point in time when he was outside of police presence, Seward informed Dr. Pike that the true cause of his condition was a police beating. Additionally, *418 co-defendant Johnson testified that the stairs at his residence were heavily carpeted.
d) Four arresting officers (Dillman, Norwood, Dantagna, and Hoyt) roused the defendant out of bed at 11:30 p.m. on January 18, 1978 in order to arrest him. Although the light may have been somewhat dim, all of the officers could see, and yet none of them noticed any of the visible injuries viewed by Dr. Pike in his examination some eighteen hours later.
e) While Dr. Pike's testimony did not pinpoint, with sufficient definiteness, the probable time when the injuries were sustained, the (January 19, 1978) 12 midnight to 2:00 a.m. period when Seward was interrogated, and allegedly beaten, falls within the period established by Dr. Pike for when the injuries could have occurred. While Pike's opinion was admittedly equivocal concerning the likely time of the injuries, he testified at one point that the injuries could have occurred no less than six hours nor more than forty-eight hours prior to the time of his examination.
If the issue in this case were to be resolved purely on credibility, defendant and Johnson versus the police officers, deference to the trial judge might prompt a decision against the defendant, Seward. That is not the case, however. There is the apparently reliable testimony of Dr. Robert Pike. Dr. Pike testified that the defendant had objective signs of injury consistent with a police beating. Further, Doctor Pike's description of the type of fall necessary to produce such objective signs of injury makes the police version of the cause of Seward's injuries improbable. At the least, the evidence preponderately establishes that Seward was beaten. In all events the state did not prove, beyond a reasonable doubt, that Seward sustained his injuries in a fall, or in some other way. Nor did they prove, beyond a reasonable doubt, that Seward's confession was given freely and voluntarily, and "not under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises." La.Rev.Stat.Ann. 15:451 (West 1981).
However, this does not end our inquiry. The state contends that, irrespective of Seward's confession, more than enough evidence existed to convict Seward. In essence, the state contends the admission of the confession constituted "harmless error."
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court noted that some errors, although of constitutional dimension, are so unimportant and insignificant that they may, consistent with the federal Constitution, be deemed harmless so as not to require the automatic reversal of a given conviction. In Chapman, the Supreme Court noted that before a federal constitutional error can be held harmless, a court "must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." 386 U.S. at 24, 87 S.Ct. at 828. In analyzing the nature of the error in question, the Chapman court adopted its prior reasoning in Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). In Fahy the court held that the query which must be answered in determining whether an error can be considered harmless is "whether there is a reasonable possibility that the evidence might have contributed to the conviction." 375 U.S. at 86-87, 84 S.Ct. at 230, 11 L.Ed.2d at 173 (emphasis supplied). In State v. Gibson, 391 So.2d 421, 427 (La.1980), we adopted the federal harmless error standard of appellate review, since the standard is "most compatible with this Court's view of its own criminal appellate jurisdiction."
It may ultimately be found that the admission of a coerced confession can never be treated as harmless error. In Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958), the petitioner, a 19 year old black man, argued that his confession was impermissibly introduced into evidence, as the confession was the product of coercion. The United States Supreme Court, after noting that the totality of circumstances indicated the confession was coerced, reversed the Arkansas state court judgment, notwithstanding the fact that *419 there may have been sufficient independent evidence to support the conviction.
Respondent suggests that, apart from the confession, there was adequate evidence before the jury to sustain the verdict. But where, as here, a coerced confession constitutes a part of the evidence before the jury and a general verdict is returned, no one can say what credit and weight the jury gave to the confession. And in these circumstances this Court has uniformly held that even though there may have been sufficient evidence, apart from the coerced confession, to support a judgment of conviction, the admission in evidence, over objection, of the coerced confession vitiates the judgment because it violates the Due Process Clause of the Fourteenth Amendment.
356 U.S. at 567-68, 78 S.Ct. at 850, 2 L.Ed.2d at 981 (citations omitted). The Supreme Court in dicta in Chapman cited the coerced confession in Payne as evidence of the type of constitutional infraction that could never be treated as harmless error. Chapman, 386 U.S. at 23, 87 S.Ct, at 827-28. See also, Rose v. Clark, ___ U.S. ___, ___, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986); Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); Arthur v. Bordenkircher, 715 F.2d 118 (4th Cir.1983); but see, United States v. Murphy, 763 F.2d 202 (6th Cir.1985), cert. denied, 474 U.S. 1063, 106 S.Ct. 812, 88 L.Ed.2d 786 (1986). Admittedly, the Supreme Court has not squarely addressed the issue following Chapman.
We pretermit the question of whether introduction of a coerced confession can ever be deemed harmless, however, since our review of this record indicates that the confession may have contributed to the jury's verdict of guilty. In all events we are unable to conclude that the error was harmless beyond a reasonable doubt.
The state's case, besides Seward's confession, consisted of circumstantial evidence coupled with eye witness identification, the latter attacked by defense counsel, who argued to the jury (and tried to prove) that the in-court identifications were tainted by earlier improperly suggestive photographic line-ups. Of course, Seward's confession was emphasized in the state's closing argument, as counsel for the state repeatedly compared Seward's version of the facts surrounding the confession with the uniform version offered by the police. Without the benefit of Seward's confession, the state, without question, had a weaker case.
In Stein v. New York, 346 U.S. 156, 192, 73 S.Ct. 1077, 1096, 97 L.Ed. 1522, 1547 (1953), the United States Supreme Court noted that "reliance on a coerced confession vitiates a conviction because such a confession combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence." It is exactly the conclusiveness of such evidence which renders its admission rarely, if ever, harmless. In effect, the introduction of such evidence necessarily renders the trial fundamentally unfair. Rose v. Clark, 106 S.Ct. at 3106. Certainly for jurors who may otherwise have harbored a reasonable doubt concerning defendant's guilt, the introduction of the confession won their vote. Although we cannot with any certainty quantify the weight given by the jury to Seward's confession, we simply cannot conclude that the introduction of the confession played no part in the jury's verdict.

Decree
Defendant Kevin Seward's conviction and sentence are reversed; the case is remanded to the Criminal District Court for the Parish of Orleans for retrial.
REVERSED AND REMANDED.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
The issue of whether defendant sustained his injuries from a fall prior to his arrest or by a beating from the police is a factual one depending primarily on the credibility of the witnesses. Two judges who heard and saw the witnesses denied defendant's motions to suppress his confession. Obviously, they believed the testimony of the police officers and rejected that *420 of defendant. I am unable to say that they erred. Nor do I consider that the circumstantial evidence created a reasonable doubt that the confession was not free and voluntary. Accordingly, I respectfully dissent.
NOTES
[1] The record is not clear in this regard.
[2] Once again, the record before us is not clear as to the nature and timing of the changeover in lawyers.
[3] A part of the delay may be attributable to Seward himself, who seemingly could not decide on appropriate defense counsel. After his conviction, Seward apparently informed the trial court in 1980 that he desired other counsel. Apparently, Seward never procured alternate counsel, and the trial court, in February, 1981, appointed a lawyer with the Orleans Parish Indigent Defender Program to represent Seward. Thus, as of 1981, three sets of defense counsel had appeared on Seward's behalf.
[4] More detailed facts concerning the murder are set forth at State v. Johnson, 438 So.2d 1091 (La.1983).
[5] At least four detectives participated in the arrest of Seward and Johnson: John Dillman, John Norwood, Donald Hoyt, and Fred Dantagna. Seward contends that Dillman, Norwood and Hoyt participated in the beatings to be discussed below.
[6] Seward's testimony was corroborated by co-defendant Johnson, who testified that he could hear the police officers cursing Seward and the beating being administered to Seward, since he had been placed in a holding cell not more than sixty feet from where Seward's interrogation was taking place.
[7] This entire scenario is vigorously denied by Seward.
[8] The record in this case includes the two hearings on the motions to suppress and the trial transcript. All of the evidence is pertinent. Furthermore, we have repeatedly stated that, in determining whether the ruling on defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion, but rather, we may consider pertinent evidence received at the trial. Cf. State v. Brooks, 505 So.2d 714, 721-22 (La. 1987); State v. Chopin, 372 So.2d 1222 (La. 1979); State v. Schmidt, 359 So.2d 133 (La. 1978).
[9] Dr. Pike was called on behalf of the state in the Johnson-Seward hearing; he was called by the defense at the second hearing on the Seward motion.