716 So.2d 403 (1998)
STATE of Louisiana
v.
Elvis JOHNSON.
No. 97-K-1701.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1998.
*404 Harry F. Connick, District Attorney of Orleans Parish, Paulette M. Holahan, Assistant District Attorney of Orleans Parish, New Orleans, for State.
Before LOBRANO, PLOTKIN and McKAY, JJ.
PLOTKIN, Judge.

STATEMENT OF THE CASE:
On September 22, 1994, the defendant was charged by grand jury indictment with one count of first degree murder. He entered a not guilty plea on September 27, 1994. Subsequently, the defendant filed a motion to suppress the confession he gave to police regarding an unrelated crime, sought to be introduced in the instant case by the State. On August 22, 1996, the State filed a notice of intent to introduce evidence of other crimes and filed answers to the defendant's motion to suppress. Testimony was heard in 1995 on the motion to suppress. The Prieur motion hearing began on September 24, 1996, continued on November 13, 1996, and concluded on December 20, 1996 with argument and rulings. The trial court granted the State's Prieur motion and denied the defendant's motion to suppress his statement. The defendant's objections were noted; the defense gave notice of intent to file writs, and filed its writ application in this Court on September 2, 1997. On September 22, 1997, we denied defendant's writ application finding no error in the ruling of the trial court. The defendant sought writs in the supreme court which were granted, remanding the case to this Court in 97-2570, ordering briefing, argument (if we so desired) and an opinion. On April 30, 1998 we ordered both parties to file any additional briefs on or before May 8, 1998. The defendant did not file a supplemental brief. The State requested an extension of time, and ultimately filed an additional brief in this Court on May 18, 1998.

ISSUE 1:
The first issue raised by defendant pertains to a statement he made to police on July 27, 1994. This statement was exculpatory as to the murder victim in this case. However, it was inculpatory as to the rape and beating of Dedra Harris, one of the other crimes which the State plans to introduce in the murder trial for which defendant has already been convicted. The defendant argues to this Court that his statement should be suppressed because the State failed to prove that the defendant had been fully advised of his Miranda rights. The defendant appears to rely on the fact that the transcript of the taped confession does not contain the specific warning that any statements made by the defendant may be used against him. Testimony on this issue was taken on May 26, 1995 at the hearing on the motion to suppress the confession. The State first presented the testimony of Detective Charles Alonzo of the Homicide Division. He was the detective investigating the murder of Virginia Mitchell, the victim in this case.
On July 27, 1994, the defendant was arrested for the rape and beating of Dedra Harris; he was arrested in his home during *405 the perpetration of the alleged crimes. According to Detective Alonzo, the defendant was given his Miranda rights by the detectives investigating the rape and the officers who first arrived on the scene. Detective Alonzo testified that he asked the defendant whether he had been "Mirandized" and the defendant indicated that he had been. Detective Alonzo did not have the defendant sign a Rights of Arrestee form nor did he see a form signed by the defendant.
Detective Tracy Mercadel of the Rape Division was the second State witness at the May 26, 1995 hearing. Detective Mercadel testified that the defendant was given his Miranda rights by two other officers, Kelly and Duzac. Officer Duzac was immediately called to testify and stated that he gave the defendant all of his rights from memory. Officer Duzac repeated the rights, specifically that the defendant had the right to remain silent, that anything he said could be used against him in a court of law, that he had a right to have an attorney present during questioning, and that if he could not afford an attorney, one would be appointed for him. These rights were provided to the defendant immediately after his arrest.
The defendant's argument to this Court is based upon a review of the defendant's statement to Detective Alonzo. The transcript of the defendant's taped statement shows that, at the commencement of the interrogation, Detective Alonzo stated to the defendant, "you know your Miranda rights, your right to remain silent and have an attorney. If you can't afford an attorney, the state will appoint an attorney to represent you before you give any statement or any questions. Do you understand that right (sic)?" The defendant indicated that he did understand and wished to talk.
The state has the burden on proving that a statement given by a defendant was freely and voluntarily given, not the product of threats, promises, coercion, intimidation, or physical abuse. La. R.S. 15:452; State v. Seward, 509 So.2d 413 (La.1987); State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Daliet, 557 So.2d 283 (La.App. 4 Cir.1990). To establish the admissibility of a statement made by an accused person during custodial interrogation, the state must prove that the accused had been advised of his/her Miranda rights and that he/she waived these rights prior to interrogation. The determination of a statement's admissibility is within the trial court's discretion, and it should not be disturbed unless it is not supported by the evidence. Daliet, 557 So.2d at 285. The defendant argues that Detective Alonzo failed to inform the defendant that any statement he made could be used against him in court, and therefore, the defendant was not fully apprised of his rights. But, several officers testified that defendant was Mirandized. More importantly, Officer Duzac specifically testified that he apprised defendant of all of his rights prior to Detective Alonzo questioning the defendant. Also, when Detective Alonzo asked defendant if he had been given his rights, he responded that he had. Therefore, given the unequivocal and unrebutted testimony of Officer Duzac that the defendant was informed of his rights, it does not appear that the trial court erred in denying the motion to suppress the confession.

ISSUE 2:
The second issue presented by this writ application is whether the trial court erred when it ruled that the State could introduce evidence of other crimes at the defendant's trial for murder.
Article 404B of the Louisiana Code of Evidence permits the use of other crimes evidence for purposes other than to prove the character of the person in certain circumstances. These purposes may include proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. La. C.E. art. 404(B)(1) reads as follows:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparations, plan, knowledge, identity, absence *406 of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In State v. Prieur, 277 So.2d 126 (La. 1973), the supreme court held that there must be clear and convincing evidence that the defendant committed the other crime before such evidence could be admissible. The Louisiana Code of Evidence originally did not affect the clear and convincing standard in regard to other crimes evidence set forth in Prieur and its progeny. C.E. art. 1103 and Comment (k) to C.E. art. 404. However, the Legislature subsequently enacted La. C.E. art. 1104 and repealed Article 1103, thereby changing the State's burden of proof at the Prieur hearing to only a preponderance of the evidence standard as is required by the federal courts. State v. Crawford, 95-1352 (La.App. 3 Cir. 4/3/96), 672 So.2d 197, writ denied 96-1126 (La.10/4/96), 679 So.2d 1379. In any event, defendant has been convicted of both prior crimes the State seeks to introduce at trial on the instant charge. Thus, those crimes were unquestionably proved beyond a reasonable doubt, thus easily satisfying the preponderance of the evidence standard.
In State v. Moore, 534 So.2d 1275, 1278 (La.App. 4 Cir.1988) writ denied, 560 So.2d 21 (La.1990), this Court reviewed the requirements for other crimes evidence:
Because of the substantial risk of grave prejudice from evidence concerning unrelated acts of misconduct, courts generally disallow testimony concerning other crimes committed by a defendant. State v. Prieur, 277 So.2d 126, 128 (La.1973). The rationale for the Prieur rule is that the state must prove beyond a reasonable doubt that the accused committed the crime with which he stands charged in order to establish guilt. State v. Ledet, 345 So.2d 474, 477 (La.1977). Evidence that the defendant may have committed the charged offense simply because he is a bad man who committed other crimes on other occasions is not sufficient to establish guilt. Id. Certain exceptions to the Prieur rule have been developed, both by statute and by jurisprudence. Under LSA-R.S. 15:445 and 446 [now C.E. art. 404], evidence of acts similar to the charged offense is admissible to show intent, knowledge or system. Additionally, the Louisiana Supreme Court has allowed evidence of other crimes exhibiting almost the identical modus operandi or system, committed in close proximity in time and place. State v. Ballard, 351 So.2d 484 (La.1977).
Furthermore, to be admissible, the modus operandi in both the charged offense and the uncharged offense must be so peculiarly distinctive that one must logically believe they are the work of the same person. Moreover, the use of the other crimes evidence must be substantially relevant for a purpose other than to show that the defendant has the propensity to commit crimes. Rather, it must tend to prove a material fact genuinely at issue. Lastly, the probative value of such evidence must outweigh its prejudicial effect. Id. (citations omitted).
In its notice of intent to use evidence of other crimes, the State alleged that the defendant committed the murder of Virginia Mitchell during the perpetration or attempted perpetration of an aggravated rape at knifepoint. The other crimes are described as the abduction and rape of T.H. on July 4, 1994. The crime is alleged to have occurred at knifepoint. The second other crime is the abduction and rape of Dedra Harris, at knifepoint, on July 27, 1994.[1] The State further averred that the three crimes are so similar as to constitute evidence of "pattern, system, and intent" under Prieur.
To support its allegation, the State prepared a chart showing the alleged similarities. However, this chart contains several entries which are clearly erroneous and/or unsupported by the testimony elicited at the Prieur hearing. The errors were so manifestly erroneous that the defendant in his writ suggests that they were a "deliberate effort" to mislead the court and warrant sanctions in the form of the dismissal of the *407 Prieur motion. Because of this, a State response was ordered. Attached to the response are various police reports containing witnesses' statements. The statement of the facts in the State's response is far more accurate than the chart contained in the original Prieur motion. The State suggests that any erroneous statements of fact in the motion were inadvertent and did not prejudice the defendant.
The defendant has not alleged that he was misled by the strength of the State's Prieur evidence. He apparently was provided with police reports and medical reports pertaining to the victims. Extensive oral argument was made before the trial court on December 20, 1996. The parties recapitulated the facts at length. There were no gross mischaracterizations of the evidence by the State at that time. Furthermore, the trial court granted the Prieur motion on the grounds that the similarities in the crimes were sufficient, not in their details, but because of the "extreme violence and mental attitude of antagonism and let's say anger towards females which is demonstrated in various ways, not always the same but in various ways during the course of the crimes." In this light, the sanctions as requested by the defendant are denied.
The facts of the crimes, as indicated by the testimony and reports, follow.

RAPE OF T.H.
T.H. testified on November 13, 1996, that on July 4, 1994, she was walking from the supermarket near her home in the St. Thomas Housing Project. The time was approximately 3:30 a.m. She had a can of beer with her. She noticed a man, whom she later identified as the defendant, near the gate of the New Orleans General Hospital. The defendant approached her, pulled out two knives, and said that he would kill her if she screamed. She accompanied him to the garden of the hospital, where he forced her to hop over the fence. The defendant then directed the victim to an area under a tree, at which time he asked her if she knew "Little Heart" and she said she did. He also asked her if she knew that "Little Heart" was dead. The defendant then directed the victim to undress; while she did so the defendant told her that he killed "Little Heart" and threatened to do the same to her if she did not cooperate. The defendant then engaged in vaginal sex with T.H., forced her to engage in fellatio, then had anal intercourse with her. When he was finished, the defendant required the victim to again perform oral sex with him. As the defendant prepared to leave the scene, he directed the victim to stay down or he would come back and kill her. The defendant took the victim's clothes and her watch with him. Her beer, her bra, and a small blade which she had dropped in the grass were left behind in the garden when the victim went for help after the defendant was gone; these items were subsequently recovered on the scene.
T.H. testified that at no time did the defendant cut or shave her hair or threaten to do so. She did not give any testimony to the effect that the defendant struck or beat her. However, the police report of this incident indicates the victim was struck in the face and consequently bruised and swollen. T.H. identified "Little Heart" as the murder victim Virginia Mitchell.

RAPE AND BEATING OF DEDRA HARRIS
The evidence regarding the crimes against Dedra Harris is hearsay only because of her death. The first source of evidence is the defendant's own inculpatory statement made on the night of the crimes. He stated that he was in the area of Broad and Washington, on his way home, when he saw Ms. Harris. He spoke with her about the possibility of having sexual relations. Ms. Harris agreed to engage in sex for $20.00, which the defendant gave her. They then rode a bus to the defendant's residence in Gentilly. After their arrival, in the defendant's bedroom, both disrobed and engaged in sexual intercourse. According to the defendant, Ms. Harris wanted to rush him, to which he objected because he had paid her the twenty dollars. At that point, things began to get "a little rough," and the victim stabbed him in the face with a pair of scissors. The defendant then placed plastic handcuffs on her and engaged in vaginal intercourse. The defendant then asked her to consent to anal intercourse, which she did. The defendant then *408 asked if he could cut her hair off her head and shave her pubic hair. She also consented to that, and he did so. The defendant continued to have intercourse with the victim. At some point, the defendant released the victim from the handcuffs. She struck him with a stick. The defendant then began to beat the victim, handcuffed her again, and repeatedly hit her. The defendant explained to Detective Alonzo that he did not mean to "really" hurt the victim and was unaware of how hard he was hitting her. He also stated that he handcuffed her only so that she would not stab him.
The injuries suffered by the victim were severe enough to require her to be hospitalized for several days and to undergo surgery. She was unable to make a statement during this time. However, she did give a statement to Detective Mercadel on August 15, 1994. The statement was recorded in the officer's report, which is attached to the State's response. In it, Ms. Harris stated that she was walking in the Broadmoor area when she was approached by the defendant who asked her if she wanted a beer. She told him no. The defendant and she then engaged in a short conversation, during which Ms. Harris assumed that the defendant was a friend of her brother. Ultimately, Ms. Harris agreed to accompany the defendant to his home, which they reached by bus. Before they entered the residence, the defendant offered the victim "twenty dollars as miscellaneous spending money." She declined the offer. They both entered the residence, where Ms. Harris was introduced to the defendant's nephew and niece. The victim then used the bathroom, and upon exiting, the defendant pulled her into his bedroom to watch television. He closed and locked the bedroom door. He also asked her to go with him to buy crack cocaine. She refused. The defendant then pushed her on the bed, pulled her shorts and underwear off, and restrained her hands and legs with plastic "flexi ties." The victim screamed and struggled, which prompted the defendant to pick up a pair of scissors and place them against her neck. He threatened to take off all her hair if she did not shut up. The defendant then shaved her scalp and pubic hair with electric shavers. The defendant left the room, returning with a toilet plunger. He had vaginal and anal intercourse with the victim and forced her to perform fellatio.
After raping the victim, the defendant took the wooden plunger and vaginally penetrated the victim with it, then forced it into her mouth. The victim was able to grab the scissors and stab the defendant with them. The defendant took the scissors away, taped her mouth shut, and beat her face, back, arms, and legs with the wooden plunger. He again used the plunger to penetrate her vaginally, anally, and orally. The defendant repeated the pattern of intercourse and penetration with the plunger again. He also struck her with the stick repeatedly.
Eventually, the victim heard the police knocking at the bedroom door. The defendant opened the door and promptly closed it. He removed the plastic handcuffs from the victim and pleaded with her not to pursue charges because he had recently been in trouble with the police. He then allowed the officers to enter the room. When the police entered, both defendant and the victim were naked. She immediately told the police that defendant had raped and beaten her. The police then called for emergency medical care because the victim was extremely swollen and bruised. The mattress was soaked with blood. At this time, they arrested defendant.
The defendant was arrested for the murder of Virginia Mitchell after his arrest for the rape and beating of Dedra Harris. This arrest was based not on an inculpatory statement made by the defendant to the police, but in part on a police interview with the defendant's nephew and brother-in-law. The defendant resided with these family members among others were home at the time of the rape of Dedra Harris. It was the defendant's brother-in-law who called the police during the rape of Dedra Harris, informing them that the defendant was killing a woman in his room. The defendant's nephew told the police that the defendant told him that he and Virginia Mitchell[2] had gone out, that they were drinking, and that the victim wanted some "clickems." As they were *409 walking, the defendant began beating the victim "for no reason." The defendant beat her with a board as they walked down Dryades Street, then dragged her into an abandoned building, where he raped her, then cut her windpipe. According to Kendrall, the defendant showed him the abandoned house, and Kendrall showed the house to the police.
Kendrall also stated to the police that the defendant had told him and his friends about other rapes he had committed; one was the rape of T.H. Kendrall's father confirmed to the police that his son told him about the defendant's statements regarding the murder of Virginia Mitchell.
Although the defendant allegedly admitted raping Virginia Mitchell, the autopsy showed no physical evidence of rape. The autopsy and lab reports show that all specimens, oral, vaginal, and anal, were negative for seminal fluid and spermatozoa. The victim had fresh bruises and lacerations in a variety of locations, including cuts across the neck. Her jugular vein had been severed, and her jaw was fractured. The victim had also been manually strangled. The victim's pubic hair had been burned off of her body. The victim's hair/braid extensions were removed from her head. A six-inch steak knife and a piece of blood-stained glass were found on the scene. The victim's green jogging pants were found in the kitchen of the abandoned house; the victim herself was found in the bathroom of the abandoned house. Her blouse and bra were pulled up around her neck. Her legs were spread apart. She had defecated on the ground in the area where her body had been found.
The autopsy revealed tatoos on the victim's hands. On the left hand was the word "Lil" and on the right, the four letters "Tody" separated by the figure of a heart.

ANALYSIS
The State must prove that the defendant was the person who had the specific intent to kill Virginia Mitchell and that he was engaged in the perpetration or attempted perpetration of a rape. La. R.S. 14:30 A(1). The facts of the rape and beating of Dedra Harris, when considered in connection with the physical condition of Ms. Mitchell's body and the defendant's statements to the police and his nephew, appear sufficiently close to be probative of both intent and identity. The defendant did not randomly abduct Ms. Harris. They apparently began having consensual sex which escalated into severe brutality and torture when she was not sufficiently cooperative in satisfying his sexual desires. Likewise, the defendant knew Ms. Mitchell and the two apparently went out together on the evening of her death. Defendant allegedly began beating her severely with a board. Also, he threatened Dedra Harris by holding a sharp instrumentality, a pair of scissors, against her neck. He allegedly slashed Ms. Mitchell's throat with a sharp instrumentality. He shaved Dedra Harris' head and pubic area. He allegedly ripped Ms. Mitchell's hair extensions off of her head and burned her pubic hair off of her body. The similar nature of these crimes is sufficient to show the intent and identity of the defendant.
As to the rape of T.H., the facts are not particularly close, either in the way the rape was perpetrated or the level of violence and antagonism demonstrated. However, the two incidents are bound by the defendant's statements to T.H. inquiring as to whether she knew about "Little Heart" and that he had killed her, and if she did not cooperate, he would do the same to her. Similarly, in State v. Phillips, 92-1063 (La. App. 4th Cir. 2/29/96), 670 So.2d 588, writ denied, 96-2131 (9/5/97), 699 So.2d 85, the defendant was charged with the armed robbery of a convenience store cashier. The cashier had been robbed the previous night as well, but the defendant was on trial for the second incident only. Nevertheless, evidence of the first robbery was admitted. This Court found that the "other crimes" evidence was properly admitted because, during the second robbery, the perpetrator made a specific reference to having robbed the victim on the previous night. This Court concluded that evidence of the earlier robbery was highly probative of identity because of the statement made during the second robbery. Likewise, T.H. testified that defendant informed her if she did not cooperate, he would *410 kill her just as he had killed "Little Heart." This is highly probative evidence of identity.
In the instant case, the two other crimes are probative under two categories, identity and intent. The incident involving Dedra Harris is highly probative of intent to kill and rape and of identity because of the similar nature of the offenses. The incident involving T.H. is not sufficiently similar to constitute a "signature" crime to prove identity; however, it is sufficiently bound to the murder through the statements made by defendant to the victim making it admissible under Phillips to prove identity.
Accordingly, we find no error in the ruling of the trial court and deny defendant relief.
WRIT GRANTED; RELIEF DENIED.
NOTES
[1] Dedra Harris was deceased at the time hearings in this case were held. Her death was apparently unrelated to the crimes. It is for this reason that her full name is used.
[2] The defendant's nephew referred to the murder victim as Linda.