511 So.2d 476 (1987)
STATE of Louisiana
v.
Jonathan C. HERSMAN.
No. 86-KA-192.
Court of Appeal of Louisiana, Fifth Circuit.
July 14, 1987.
*477 John M. Mamoulides, George Mustakas, Dorothy A. Pendergast, Dist. Atty., Gretna, for plaintiff-appellee.
Mark Michael Gonzalez, New Orleans, for defendant-appellant.
Before BOWES, GAUDIN and DUFRESNE, JJ.
GAUDIN, Judge.
Jonathan Hersman was convicted by a 12-person jury in the 24th Judicial District Court for the February 26, 1985 killing of his roommate, Scott Witt. Hersman had pled not guilty and not guilty by reason of insanity but he was found guilty of second degree murder and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
On appeal, Hersman does not argue that he was not involved in Witt's death or that he was legally insane at the time of the crime. Instead, he assigns these district court errors:
(1) It was error not to suppress the victim's body as it was evidence illegally obtained,
(2) He did not waive assistance of counsel before confessing,
(3) His confession should have been suppressed,
(4) The trial judge erred in not charging the jury that it was the duty of the jury to give the defendant the benefit of every reasonable doubt arising out of the lack of evidence,
(5) The trial judge erred in not properly charging the jury on the law of manslaughter, and
(6) The conviction was not based on substantial evidence as required by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and LSA-R.S. 15:438.
Finding these assignments of error without merit and finding no errors patent, we affirm Hersman's conviction and sentence.
Hersman's trial took place on November 4 and 5, 1985. A sanity hearing was previously held on May 2, 1985, at which time *478 two psychiatrists testified that Hersman was fully able to understand the nature of the court proceedings and able to assist his counsel. The motion to suppress evidence and Hersman's confession were heard jointly on June 19 and 20, 1985.

HERSMAN'S ARREST
Hersman allegedly strangled Witt in the apartment the two men shared at 1004 Eli Court in Gretna, Louisiana. On the following afternoon, Hersman drove Witt's Honda automobile, with the body in the trunk, to Pensacola, Florida, where Hersman visited a friend, Christy Cotton. Hersman told Miss Cotton that he had killed a man and placed the body in the car trunk. He said that he was going to return to New Orleans and dump the body in a swamp and leave Witt's automobile at the airport in Kenner so it would appear Witt had boarded an airplane and left town.
Later that same night, Hersman left Pensacola to drive back to New Orleans, leaving at Miss Cotton's trailer some of Witt's personal possessions, including records and a VCR. Shortly thereafter, Miss Cotton's roommate, Shellye Ansag, arrived home. When Miss Ansag heard what Hersman had told Miss Cotton, she called the Escambia County Sheriff's Department and talked to police officer William Pippin. She told him about the incident involving Hersman and furnished him with a description of the accused, the car and the route Hersman was following back to New Orleans.
Pippin immediately broadcasted this information over a telex, directing it to state troopers on Interstate 10 in Alabama, Mississippi and Louisiana. This bulletin was broadcasted:
"Johnny Hersman, D.O.B. 2-27-67, white male, five foot six, shoulder-length black hair and moustache; subject will be driving a gray four-door Honda with a possible Louisiana plate. Suspect stated to friends from Pensacola that he had killed a man in New Orleans and he had the body in the trunk of the car. Suspect departed Pensacola at approximately 9:30 p.m. en route back to New Orleans."
Shortly after midnight on February 28th, Lieutenant John Ramirez of the Louisiana State Police, Troop L, received the teletype message from Pensacola and passed the information on to trooper Scott Illing, who was patrolling in the Slidell area.
An hour or so later, around 2 a.m., Illing came upon a Honda parked on the U.S. Highway 11 bridge between Slidell and New Orleans with only parking lights on and the motor running. When Illing asked the driver why the car was stopped on the bridge, he was told that the vehicle had engine trouble. The officer instructed the driver to get his Honda off the bridge and onto the side of the highway, and positioned his police vehicle behind the Honda in order to be of help if necessary.
While following the Honda off the bridge in the direction of New Orleans, Illing remembered the bulletin he had received recently from Ramirez. Although the color of this Honda was somewhat differentit was brownish instead of grayand there was an Illinois license plate rather than the possible Louisiana one, everything else fit the details in the bulletin. The driver was a young white man of about 18, approximately five feet, six inches tall with shoulder-length black hair and a black moustache, and he was driving a four-door Honda toward New Orleans. He was just about where he would have been if he had left Pensacola about 9:30 that evening.
With all of this in mind, Illing stopped the Honda on the New Orleans side of the bridge. He approached the Honda on foot and asked the driver to step out and produce his driver's license. When the officer saw on the driver's license the name Jonathan Hersman, his suspicions were confirmed. Asking the unsuspecting Hersman to remain where he was, Illing returned to his police vehicle and contacted Ramirez. He related what had occurred and asked for back-up help.
After talking to Illing, Ramirez made a telephone call to Escambia County Sheriff's Office and spoke to Pippin, the Florida deputy who had issued the bulletin earlier that night. Pippin confirmed the details in the bulletin, and advised Ramirez that his *479 information had come from two ladies who were friends of Hersman, Shellye Ansag and Christy Cotton, and that Miss Cotton had been told about the murder and the body in the trunk by Hersman himself. Ramirez then got back in touch with Illing. He told Illing about the confirmation of the bulletin from Escambia County and added that assistance was on his way.
Approximately 20 minutes later, after trooper Kenneth Wichterick and St. Tammany Parish deputy Hal Taylor had arrived, Illing asked Hersman if it was permissible to look in the trunk of the Honda. Hersman refused to permit this and would not sign a consent-to-search form. Illing, believing he had probable cause to search the trunk, reached inside the Honda, pulled a latch near the driver's seat and opened the trunk revealing the body of a dead man. Hersman said that the deceased was his roommate but that he didn't know what had happened.
Illing, explaining why he opened the trunk without Hersman's consent, said:
"Because ... we didn't know if somebody was going to be dead or not. We didn't know if somebody wasit was a simple kidnapping in the trunk of the car, for the reason that there could still possibly be a live person in there was the reason we automatically popped it."
Also found in the trunk, along with Witt's remains, was the Louisiana license plate that had been issued for the victim's Honda.
Hersman was immediately arrested and his Miranda[1] rights read. He was told that he could remain silent, that anything he said could be used against him, that he had the right to have an attorney present and that if he couldn't afford an attorney, one would be appointed free of charge. Hersman signed a form stating that these rights had been read to him but his signature is not on that segment of the form waiving these rights.

ASSIGNMENT NO. 1
In this assignment of error, Hersman contends that the police officers did not have probable cause to open the Honda trunk over his objection and seize Witt's dead body as evidence.
When the motions to suppress were heard, the prosecution called Ramirez, Illing, Wichterick and three other policemen.[2] Hersman also testified, saying (1) that he had not been advised of his constitutional rights when first stopped by Illing, (2) that he told Illing and later other officers who arrived at the arrest scene that he (Hersman) did not want to answer questions and that he wanted to speak to an attorney, and (3) that he did not agree to a search of his automobile. He said he signed several forms because "... I just kind of wanted to get it over with and get out of there. I was, you know, tired and I didn't want to argue with them."
Hersman later admitted, on cross examination, that he was read his rights when he was arrested and again when he was taken to Jefferson Parish.
In any event, when the trial judge denied the motion to suppress evidence, he said:
"... extenuating circumstances were involved because of the bulletin stating about a dead body ... and the officers not knowing whether there was a death or not or if somebody was severely injured."
Warrantless searches are prohibited by Art. 1, Sec. 5 of the Louisiana Constitution and the Fourth Amendment to the United States Constitution unless probable cause exists for an exception to the general, constitutional rule. In State v. Burks, 466 So.2d 681 (La.App. 5th Cir.1985), this Court, citing Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) and numerous other cases, said that the warrantless search of an automobile stopped by police officers who had probable cause to believe the vehicle contained contraband *480 was not unreasonable. The "probable cause" in Burks consisted mainly of information supplied by a confidential informer.
Here, the probable cause included information provided by two identified women purporting to have firsthand knowledge of the events they related. It also included verification by Illing of much of the information obtained from the women. These facts and circumstances, combined with the possibility that the victim may still have been alive, justify the stopping of the Honda and the ensuing search despite Hersman's protest.
Appellant correctly points out that the subject Honda was brown with an Illinois license plate and not gray with a Louisiana tag. There were, however, other and more critical considerations, including the fact that Hersman's physical characteristics perfectly matched those of the subject described in the police bulletin. Also, he was in a four-door Honda driving toward New Orleans and he was approximately where he should have been had he left Pensacola when the bulletin said he did.
After Illing assisted the stalled car off the Highway 11 bridge, he had legitimate reasons to inquire further, which he did.

ASSIGNMENTS 2 AND 3
In these assignments of error, Hersman alleges that any statements he made, oral or on tape, were coerced and involuntary and that his rights against self-incrimination were not explained. Of particular concern is a taped confession he made while in custody in Jefferson Parish.
Hersman made statements at three points in time which were admitted at trial: (1) when he was arrested, (2) at the New Orleans police station and (3) in Jefferson Parish.
Following Hersman's arrest on Highway 11, Sgt. Malcolm Cheramie and detective Robert McNeil of the New Orleans Police Department arrived. Cheramie testified that he advised Hersman of his constitutional rights and then asked him if he wanted to give a statement. Hersman, according to Cheramie, said yes; and then Hersman said, "I killed a man." Cheramie asked Hersman who the man was, and Hersman said it was Scott Witt.
Cheramie contacted the Jefferson Parish Detective Unit and asked that someone be dispatched to the New Orleans Detective Bureau, where Hersman was being taken. Detective Bernard Wortmann of the Jefferson Parish Sheriff's Office went to New Orleans where Hersman was again read his Miranda rights. According to Cheramie, McNeil and Wortmann, Hersman indicated that he understood his rights. All three officers said that Hersman then willingly answered questions, that no threats were made and that no promises or inducements were tendered. Hersman, the officers stated, did not ask for an attorney.
Hersman was then taken to Jefferson Parish. Wortmann went to 1004 Eli Court and seized several pieces of evidence and photographed the apartment. Wortmann then went to the Jefferson Parish Detective Bureau and again got a statement from the defendant. This statement was taped. Wortmann testified that Hersman first said that he wasn't sure if he wanted to make an official statement without an attorney present. Wortmann told him he had already made an official statement in New Orleans and that this was to have his own words on tape. Hersman then agreed to make the taped statement and expressed a desire to see an attorney prior to appearing in court. Hersman also signed a waiver of rights form.
When Wortmann testified when the motions were heard, he was asked whether Hersman asked to speak with an attorney before the taped questioning began. Wortmann said:
"He did when I asked him if he wanted to discuss it. I wanted to tape it which is a normal procedure to tape any kind of conversation. He did inquire in saying he wasn't sure if he wanted to make an official statement on the tape, you know, prior to talking to an attorney.
"I advised him that earlier he had made an official statement. After I had advised him of his rights he acknowledged that and the fact that he understood his rights. I think he was a little shy on the *481 tape recorder which is fairly normal. From that point I asked him if he did or didn't want to give a statement on the tape. The reason for the tape was to let him tell it in his own words without any discrepancy. He agreed to do so. The only other inquiry he made about an attorney was the assurance that before he went to court he would be able to speak with an attorney. I advised him that is his right."
Wortmann said that Hersman was not threatened, coerced or intimidated and that the statement was "totally voluntary."
When Wortmann was under cross examination, he stated:
"He (Hersman) seemed a little nervous to the tape recorder and he responded by saying he wasn't sure if he wanted to give an official statement on the tape without talking to a lawyer.
"... I told him that the reason I wanted it on tape was so that he could tell it in his own words without any discrepancies."
On tape, Hersman repeated basically what he had told the police officers in New Orleans. There were, incidentally, some pauses in the tape. Wortmann explained that he stopped the machine at certain times to collect his thoughts and think about the next question. Nothing vital was omitted, he said.
During the actual trial, Wortmann again testified about the taped confession. This colloquy took place:
Q (by Hersman's trial attorney)
Before he made a statement, did he ask you to speak to an attorney?
A No, not directly.
Q He did not ask you to have an attorney present before he made a statement?
A No.
Q Officer Wortmann, do you recall testifying in a pretrial motion in this matter?
A Yes, sir, I do.
Q You don't recall at that time testifying that he asked you for an attorney before you started this tape?
A No, sir, he didn't. He asked me for advice as to an attorney.
Q I'm sorry?
A He asked me for my advice as to an attorney before he gave a taped statement.
Q I don't understand your answer: "He asked for your advice"?
A He didn't refuse to give a statement or ask for an attorney at that time; he asked my advice on whether he should have an attorney. I told him that was his right.
Q Did he ask for an attorney at that point?
A No, he directly did not.
MR. MUSTAKAS:
Your Honor, this is getting a bit repetitious. He's asked this three or four times and the Officer has made it as plain as possible.
MR. TOMPSON:
He has answered the question but he has not made it as plain as possible.
MR. MUSTAKAS:
Well, he's now testifying, Your Honor.
MR. TOMPSON:
I didn't hear the answer to the question over Mr. Mustakas' objection.
THE COURT:
Okay. Overruled. I'll let you ask him one more time.
BY MR. TOMPSON:
Q Did he ask for an attorney?
A Not directly, no, sir.
After carefully reviewing the testimony, we cannot say that Hersman was unfairly or unconstitutionally taken advantage of by investigating police officers at the arrest scene, in New Orleans or in Jefferson parish, notwithstanding Hersman's inquiry in Jefferson about an attorney. Under Miranda v. Arizona, supra, and many subsequent cases with similar holdings, interrogation must quickly cease when an attorney is straightforwardly asked for. However, if the request is equivocal, a questioning official can permissibly inquire further to clarify the subject's wishes. The following quotation is from Nash v. Estelle, 597 *482 F.2d 513 (5th Cir.1979), heard by the court en banc:
"While the suspect has an absolute right to terminate station-house interrogation, he also has the prerogative to then and there answer questions, if that be his choice. Some persons are moved by the desire to unburden themselves to confessing their crimes to police, while others want to make their own assessment of what to say to their custodians.
"[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). When, as in the case at bar, a desire for immediate talk clearly appears from the suspect's words and conduct, but he also states he wants a lawyer (i.e., "I would like to have a lawyer, but I would rather talk to you"), it is sound and fully constitutional police practice to clarify the course the suspect elects to choose." (Underlining provided.)
Miranda itself contemplated that when faced with constitutional options, a suspect might be indecisive about an attorney. Nash v. Estelle, at page 517, contains this quotation from Miranda:
"If [a suspect] is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing Agent."
See also Bradburn v. McCotter, 786 F.2d 627 (5th Cir.1986), wherein a suspect said in Nevada that he wanted to wait until he got back to Dallas to get a court-appointed lawyer. This was considered at most an equivocal request for assistance of counsel and did not bar continued interrogation in Nevada.
Was Hersman indecisive in the Jefferson Parish police station about wanting a lawyer? The taped confession is no indication that he was. Early in the recording, Hersman was asked whether he had been advised of his rights and if he fully understood them. He said yes, and then proceeded to articulately and in minute detail describe the happenings leading up to Witt's death and his confused attempt to dispose of the victim's body. The tape does not show any reluctance on Hersman's part to answer any and all questions.
If Wortmann's testimony can be construed to mean that Hersman did in fact invoke his right to counsel, further interrogation would be constitutionally acceptable only if Hersman initiated additional questioning. See Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). We do not, however, nor did the trial judge, find that Wortmann's testimony and the taped confession, singularly or combined, establish the fact that Hersman wanted an attorney and would not proceed without one. The following colloquy is from Wortmann's testimony when the motions were heard:
Q Who was present when you spoke to him?
A Sergeant Cheramie and one other detective in his squad.
Q Do you recall the name of the other detective?
A Not off hand.
Q Did you read him his rights?
A Yes, sir. I advised him of his constitutional rights according to Miranda before I asked him any questions.
Q Did you read them to him or did you do it from memory?
A I did it from memory.
Q Did he acknowledge he understood his rights?
A Yes, he acknowledged he did understand.
Q Did he ask for an attorney at this time?
A No, sir, he didn't.
Q Did he tell you he didn't want to talk to you? Was he unwilling to talk to you?

*483 A He didn't refuse to talk at all. He willingly answered all of the questions.
Q Did you threaten him at any time?
A No, sir.
Q Did any one of the officers threaten him?
A No, sir.
Q Did anyone curse him in any kind of manner, any way, shape, or form?
A No, sir, not at all.
Q Was he offered anything as an inducement to speak to you?
A No, sir.
Q How long did the conversation take place at the New Orleans Detective Bureau?
A It was fairly brief, roughly 25 minutes at the most.
Q And what did you do after this conversation?
A Basically inquired as to what had happened, place, you know, times and he ran through it briefly.
Q What did you do after that?
A After he had given me a statement he was already in custody and he was taken to the New Orleans Central Lockup. At that time I went ahead with the further investigation of the original scene on Eli Court. Later on that morning, just prior to, I believe 10 a.m., he was transported from New Orleans to the Jefferson Parish Detective Bureau at which time I went back to the bureau and met him there and interviewed him again.
Q Do you know who transported him?
A Lieutenant Lamier of the homicide division.
Q Did you speak to him again subsequently to him being brought to Jefferson Parish?
A When he arrived at the bureau, yes, I did.
Q Did you read him his rights again at that time?
A Yes, sir, I did.
Q Officer, I'm going to show you two forms that were provided to me actually from your office and I'll mark them S2 and S3 for identification and ask you if you can identify these forms, please.
A Yes, sir. These are rights forms. I read Mister Hersman his rights from the forms and also the waiver clause and he signed them both accordingly.
Q Did he sign those in your presence?
A Yes, sir, he did.
Q I notice there are two copies. Did you do it twice? Why the two copies?
A He signed both of them. It's just normal procedure with us.
Q Did you also sign them?
A Yes, sir, I did.
Q Was anyone else present when you did this?
A No, sir.
Q At the time did Mister Hersman ask to speak to an attorney?
A He did when I asked him if he wanted to discuss it. I wanted to tape it which is normal procedure to tape any kind of conversation. He did inquire in saying he wasn't sure if he wanted to make an official statement on the tape, you know, prior to talking to an attorney.
Q What did you do at that time?
A I advised him that earlier he had made an official statement. After I had advised him of his rights he acknowledged that and the fact that he understood his rights. I think he was a little shy on the tape recorder which is fairly normal. From that point I asked him if he did or didn't want to give a statement on the tape. The reason for the tape was to let him tell it in his own words without any discrepancy. He agreed to do so. The only other inquiry he made about an attorney was the assurance that before he went to court he would be able to speak to an attorney. I advised him that is his right.
Q Did he give you a statement at that time?
A Yes, sir, he did.
Q Did you tape it at that time?
A Yes, sir, I did.

*484 Q Did you at any time before taking this statement threaten him or curse him or do anything to intimidate him to make him give you a statement?
A No, sir.
Q The statement was voluntary.
A It was totally voluntary.
The state argues that even if it was error to allow the taped confession in evidence, it was harmless. Hersman had already admitted the killing to Miss Cotton in Pensacola and to various police officers in New Orleans.
In any event, the Supreme Court of Louisiana has repeatedly held that a trial judge's determination of a confession's admissibility will not be disturbed on appeal unless it was not supported by the evidence. See State v. Nuccio, 454 So.2d 93 (La.1984); State v. Vessell, 450 So.2d 938 (La.1984); and State v. Wilms, 449 So.2d 442 (La.1984). When reviewing the trial court's ruling on admissibility, the reviewing court may look to the totality of evidence presented at the suppression hearing and at the trial itself. See Wilms, supra; also, State v. Benoit, 440 So.2d 129 (La. 1983).
The totality of evidence here, which includes Hersman's testimony when the motions to suppress were heard pitted against (1) the offsetting testimony of various police officers, (2) the Miranda forms signed by Hersman and (3) Hersman's apparent willingness to have his statement in Jefferson taped, supports the trial judge's finding that the confessions were admissible.

ASSIGNMENTS 4 AND 5
In these assignments of error, Hersman argues that the trial judge (1) did not instruct the jury to give the defendant the benefit of every reasonable doubt arising from the lack of evidence and (2) did not properly charge the jury as to the law governing manslaughter.
The record indicates (1) that the jury was told to give Hersman the benefit of every reasonable doubt arising from the lack of evidence and (2) that a manslaughter charge was read. Whether the manslaughter charge was incomplete, as appellant contends, is arguable.
Even if the trial judge erred in these respects, Hersman did not contemporaneously object to the charge and cannot now complain. See State v. Simmons, 443 So.2d 512 (La.1983) and also LSA-C.Cr.P. art. 801, which reads:
"A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection."
In State v. Marcell, 320 So.2d 195 (La. 1975), the Supreme Court stated:
"The contemporaneous objection rule ... is necessary in order to promote judicial efficiency and in order to prevent a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors that might easily have been corrected by objection at trial."
These assignments of error are without merit.

ASSIGNMENT NO. 6
Hersman asserts in this assignment of error that the evidence did not support the guilty verdict and that the prosecution failed to prove beyond a reasonable doubt that he had the specific intent to kill Witt. Hersman contends that at best specific intent was established by circumstantial evidence which did not exclude every reasonable hypothesis of innocence as required by LSA-R.S. 15:438.
Second degree murder, in pertinent part to this case, is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1.
At trial, the State called various law enforcement officers, including, Pippin, Ramirez, Illing, Wichterick, Cheramie and Wortmann, and also Miss Cotton, Miss Ansag and Dr. Monroe Samuels, the forensic pathologist who performed the autopsy on *485 Witt's body. By and through these witnesses, the prosecution attempted to prove that Hersman showed no remorse but instead bragged (to Miss Cotton) about the killing, that he did not summon medical help or the police after it appeared Witt was dead, that he took possession of Witt's money and other valuables and that he planned to dispose of the body and make it appear Witt had left the New Orleans area.
Dr. Samuels testified that strangling is not instantly accomplished but that it takes "a minute or two minutes" to render a victim unconcious and "probably four to five minutes" to cessation of heartbeat. This helps prove, according to the prosecution, that Hersman intended to kill Witt.
Apparently, Hersman and Witt had struggled before Witt was rendered unconcious and tied to a barber chair in the apartment. When Witt regained conciousness and started to free himself, Hersman stuffed a towel in his mouth, causing death.
Hersman had just been released from parish prison, where he had been jailed because of a forgery charge brought by Witt. Miss Cotton said that Hersman told her "... that he had killed a guy because of the dealer that was going to have him put back in jail." Hersman did not tell Miss Cotton that the killing was unintentional or accidental. Miss Cotton said that Hersman did not appear to feel guilty and that he dared Miss Cotton to look in the car trunk.
Miss Cotton was the final prosecution witness and unquestionably her testimony was very damaging to Hersman.
The defense called Dr. David Shraberg; Mrs. Sue Hall, the defendant's mother; and Hersman himself, who was sworn in as a witness only to say, outside the jury's presence, that he agreed with his attorney's recommendation that he (Hersman) not take the witness stand in his own behalf.
Mrs. Hall testified, generally, about her son's childhood and his later disclosure that he was a homosexual. Hersman was 20 years of age when arrested for Witt's murder.
Dr. Shraberg, a psychiatrist, testified about Hersman's personal and adjustment problems, caused in part by his admitted homosexuality. When Dr. Shraberg was asked whether Hersman was able to distinguish between right and wrong at the time Witt died, he replied:
"I certainly wouldn't professionally be able to make a definite decision one way or the other. In other words, saying at the time of the crime he actually knew right from wrong when he was killing this man, he certainly knows that murder or killing is wrong every time I've interviewed him, but I really couldn't say at the time of the crime."
On cross examination, Dr. Shraberg said that Hersman was legally sane in spite of his personality disorders. Hersman has, according to Dr. Shraberg, above average intelligence.
In assessing the legal sufficiency of evidence, the reviewing court must determine whether, after viewing the direct and circumstantial evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This is the standard proclaimed by and in Jackson v. Virginia, supra, State v. Barberousse, 480 So.2d 273 (La.1985), State v. Captville, 448 So.2d 676 (La.1984), and many other cases. R.S. 15:438, dealing with circumstantial evidence, does not establish a separate test from Jackson v. Virginia but is instead a helpful methodology for determining the existence of reasonable doubt. See State v. Captville, supra, and State v. Porretto, 468 So.2d 1142 (La.1985). Ultimately, all evidence must be sufficient to support the conclusion that a defendant is guilty beyond a reasonable doubt.
The jury heard the witnesses, listened to the trial judge's charge and found that Hersman did have the specific intent to kill or inflict great bodily harm in spite of his taped denial. We are not inclined, and indeed this is not our function, to substitute our judgment for that of the jurors and conclude that Hersman did not have specific intent when there was ample if not overwhelming proof of specific intent.
*486 Although intent is a question of fact, it need not be proven as a fact. It may be inferred from surrounding circumstances and proven wholly or partially by circumstantial evidence. See LSA-R.S. 15:445 and State v. Butler, 462 So.2d 1280 (La. App. 5th Cir.1985), which stated at page 1283:
"Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act ..."
We are mindful of State v. Lombard, 486 So.2d 106 (La.1986), which reduced a second degree murder conviction to manslaughter because the crime was committed in a sudden passion or heat of blood, and other Supreme Court opinions overruling trial jury findings concerning specific intent.
Hersman's record, however, indicates that he had a reason for being angry with Witt. Hersman then instituted the altercation, rendered Witt unconcious, tied him to the barber's chair and then inserted the death-causing towel.
The evidence, direct and circumstantial, supports the jury verdict. Appellant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Malcolm Cheramie and Robert McNeil of the NOPD and Bernard Wortmann of Jefferson Parish.