629 So.2d 468 (1993)
STATE of Louisiana
v.
William SIMPSON, Jr.
Cr93-712.
Court of Appeal of Louisiana, Third Circuit.
December 8, 1993.
*470 Michael Harson, Lafayette, for State.
Alfred Frem Boustany II, Lafayette, for William Simpson, Jr.
Before GUIDRY, KNOLL and SAUNDERS, JJ.
GUIDRY, Judge.
The defendant, William J. Simpson, Jr., was convicted after trial by jury of the first degree murder of his two-year old daughter, Rachel. He was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
On appeal, the defendant assigned four errors, but in brief, argues only two of the assignments, both relating to his pre-trial motion to suppress. The two assignments concern the trial court's refusal to suppress statements made by defendant and physical evidence seized by investigators from the defendant's home without a search warrant. Assignment of error number three was abandoned by defendant and will not be reviewed on appeal; Uniform Rules of Courts of AppealRule 2-12.4. Assignment of error number four requests an error patent review.

FACTS
Rachel Simpson was killed on the morning of March 28, 1988. The defendant, who is divorced from Rachel's mother, had moved into his mother's house located at 103 Sand Pebble in Lafayette, Louisiana. Burke "Blackie" Fontenot, the boyfriend of defendant's mother, Dorothy Simpson, moved into the house two days before the murder. Fontenot testified that, on March 27, 1988, he and Dorothy Simpson picked up Rachel from her mother's home in Broussard, Louisiana so that defendant could exercise his visitation rights.
On the morning of Monday, March 28, 1988, Fontenot and Ms. Simpson left the house at 7:15 a.m. to go to work. Fontenot testified that, before leaving, he did not see either the defendant or Rachel. At 9:30 a.m., Fontenot returned to the house to get his car. He met the defendant outside as the defendant was closing the passenger door to his truck. Since the house was locked, Fontenot asked the defendant to let him inside. Defendant complied with Fontenot's request then left in his truck, telling Fontenot he was going to look for a job. Fontenot stayed in the house for a few minutes, noticing nothing unusual, and then left.
Fontenot was at the house again between 2:00 p.m. and 4:00 p.m. to move in more of his personal belongings. He returned at 5:30 p.m. and, when telephoned by Rachel's mother and aunt inquiring about the child, he went into the bedroom where defendant and Rachel slept. On a chest of drawers in the room he found a nine inch butcher knife and took it to the kitchen. Fontenot did not turn on the room's light and noticed nothing suspicious therein.
At some point between 6:00 p.m. and 7:00 p.m., Fontenot looked at the knife and, for the first time, noticed blood on the blade. He called the police. Sheriff Deputies Bernius and Hebert arrived and examined the knife. Fontenot related his suspicions of the defendant because he had not returned all day and Rachel's mother and aunt were trying to locate her. Deputies Bernius and Hebert asked him to show them where he found the knife.
Fontenot took the deputies to defendant's bedroom and, when they turned on the room's light, they observed blood on the floor. The room was in a state of disarray. Clothes were piled in stacks on the floor, empty food containers were throughout, and beer cans were visible around and under the bed. As the deputies were about to leave the room, Deputy Bernius picked up the bedspread and discovered Rachel's body rolled up in and covered by the bedspread and sheets.
At trial, the State and defendant stipulated that Rachel was strangled and stabbed, and died as a result of the stab wound with a co-factor of asphyxiation. When the defendant's taped confession was played to the jury, the defendant described how he became angry at his daughter during breakfast, and hit her, strangled her with one of Fontenot's belts, and when she did not die, stabbed her with a knife he secured from the kitchen. A suicide note and loaded shotgun were found *471 in his room. A deputy eventually located the defendant in the parking lot of Women's and Children's Hospital in Lafayette. The defendant was arrested, informed of his rights and transported to the sheriff's office by Deputies Bernius and Hebert.
Defendant waived his Miranda rights after being informed of such and gave a tape recorded confession. After his confession, the defendant spoke with his mother in the presence of Detective Kerry McGovern, whom the defendant requested to remain in the room. Detective McGovern heard defendant tell his mother, "Mom, you know how she aggravated me," when she asked him why he did it. Ms. Simpson did not recall her son saying that, but she did recall him saying "he did not know, he was sorry he had done it".

ERRORS PATENT
La.C.Cr.P. art. 930.8 provides that at the time of sentencing the trial court shall inform the defendant of the three-year prescriptive period for seeking post-conviction relief. The record shows that the court did not so inform the defendant. This defect is not grounds to reverse the sentence or remand the case for resentencing. La.C.Cr.P. art. 921. The three-year prescriptive period does not begin to run until the judgment is final. La.C.Cr.P. arts. 914-922. The trial court is directed to inform the defendant of the provisions of Article 930.8 by sending appropriate written notice to the defendant within ten days of the rendition of this opinion and to file written proof that the defendant received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La. App. 3rd Cir.1993).

ASSIGNMENTS OF ERROR NOS. 1 AND 2
Defendant filed numerous pre-trial writ applications with this court and the Louisiana Supreme Court. In a prior writ application, Simpson sought review of the identical issues he raises in these assignments of error, i.e., denial of his motion to suppress. State v. William J. Simpson, Jr., an unpublished writ bearing docket number K92-201 (La.App. 3rd Cir., May 18, 1992). This court rejected the defendant's claims that the trial court erred in denying his motion to suppress the confession, finding that the evidence presented supported the trial court's conclusion that defendant's statement was voluntary. This court also held that the trial court did not err in refusing to suppress the physical evidence seized at the scene of the crime. In doing so, the writ panel found no error in the trial court's determination that the forensic investigator who actually "seized" the evidence was on the premises with the permission and cooperation of Fontenot. The trial court, in its reasons for ruling on the motion to suppress, determined that Fontenot had "common authority" to consent to a search of the house.
The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Decuir, 599 So.2d 358 (La.App. 3rd Cir.), writ denied, 605 So.2d 1095 (La.1992). When a defendant does not present any new evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. See, e.g., State v. Regan, 601 So.2d 5 (La. App. 3rd Cir.1992), writ denied, 610 So.2d 815 (La.1993); State v. Wright, 564 So.2d 1269 (La.App. 4th Cir.1989). Judicial efficiency demands this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. State v. Decuir, supra, at 360.
It is well settled in Louisiana jurisprudence that, in determining whether the ruling on a defendant's motion to suppress was correct, the reviewing court is not limited to the evidence adduced at the hearing on the motion. Rather, it may also consider pertinent evidence received at the trial. State v. Seward, 509 So.2d 413, 416 fn. 8 (La.1987) and cases cited therein. At defendant's trial, new evidence was presented which clarified the facts surrounding the arrest and the seizure of physical evidence at the Simpson residence. Unlike the Seward case, in which the new evidence presented at trial resulted in suppression of evidence and a reversal of the defendant's conviction, the *472 new evidence presented at Simpson's trial further strengthens the trial court's decision to deny suppression.
Suppression of Defendant's Confession
The evidence presented at trial concerning this issue included the testimony of Deputy Peter Bernius, who did not testify at the previous suppression hearing. Detectives Comeaux and McGovern, who took the defendant's recorded confession, were the only State's witnesses who testified on this issue at the suppression hearing. According to Deputy Bernius, the defendant was arrested, advised of his rights, handcuffed, and placed in his patrol car. Deputy Bernius transported the defendant to the sheriff's office. He watched over the defendant until the detectives arrived to speak with him. Deputy Bernius testified that neither he nor any other officers tried to interrogate the defendant during his transport from the scene of the arrest and during the wait for the detectives. Other than confirming that the defendant understood his Miranda rights, no one questioned Simpson.
When defendant arrived at the sheriff's office, Detectives Comeaux and McGovern explained to defendant his Miranda rights and defendant signed a "Rights of Arrestee" form acknowledging this explanation. He then waived his rights and decided to give a statement. The detectives spoke briefly with defendant and then recorded a statement from defendant.
The taped statement begins with the detectives explaining to defendant the "Rights of Arrestee" form and defendant acknowledging he understood each constitutional right. The preliminary questions were about defendant and his daughter. Defendant told the detectives his mother had picked up his daughter around 9:00 p.m. the night before the murder. Defendant then said his mother and Fontenot had left for work before 8:00 a.m. on March 28, 1988. He initially refused to explain what happened on that morning and claimed to remember nothing. Thereafter, the detectives informed defendant what they knew about the case. Defendant was again asked what happened and he first responded, "Nothing, really," but then began to tell the detectives what happened. Defendant never declined to answer a question nor did he exercise any of his rights as an arrestee.
At the hearing on the motion to suppress, defendant claimed he was scared and intimidated by all of the armed police officers. Defendant further claimed he told the detectives he did not have to talk to them, he did not have to give a statement, and he did not want to give them one. On cross-examination, when the prosecutor asked defendant whether he recalled being informed of his rights as an arrestee, defendant responded that he either did not remember it or he did not understand it.
Detective Comeaux testified that, after being advised of his Miranda rights by Detective McGovern, the defendant signed the waiver of rights form in his presence. According to Comeaux, no law enforcement officials coerced, threatened, or induced Simpson to give a recorded statement. The defendant also never asked to consult with an attorney. Detective McGovern, in whose office the taped statement was made, corroborated the testimony of Detective Comeaux.
In Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court concluded that when a defendant invokes his constitutional right to silence, the validity of any subsequent waiver will depend upon the scrupulous honoring of that right by the police. The question of whether a defendant's rights are "scrupulously honored" is a factual issue which depends upon the totality of the circumstances involved under the particular facts of each case. State v. Brooks, 505 So.2d 714 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Factors to be considered were listed in Brooks, supra, at 722, as follows:
One factor to be considered is who initiates the further questioning. Other factors include "the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on *473 the accused by the police between the time he invoked his right ... and the subsequent interrogation". State v. Harper, 430 So2d 627, 633 (La.1983).
As noted in North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the defendant's waiver of his right to silence does not have to be explicit. The court reasoned:
An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated. (footnote omitted). Id., 441 U.S. at 373, 99 S.Ct. at 1757.
In State v. Taylor, 490 So.2d 459 (La.App. 4th Cir.), writ denied, 496 So.2d 344 (La. 1986), the police read Miranda rights to the defendant. He then said he did not want to talk or make any statements. The policeman then "explained" to defendant what the investigation would entail, including a possible line-up for the robbery victim to attempt to identify the assailant. After five minutes of explanation and exchanges, the defendant agreed to talk about the robbery but would not give a written statement. Citing Michigan v. Mosley, supra, the court upheld the admissibility of the statement, ruling that nothing in Miranda prevents a defendant from changing his mind about giving a statement and that the policeman's "explanation" aided the defendant in making an informed and intelligent decision to waive his right to silence. State v. Taylor, supra, at 461.
In State v. Daniel, 378 So.2d 1361 (La. 1979), the defendant gave a response of a "weak mild no" when asked whether he wished to talk to authorities. A prosecutor who was present told the defendant, "Before you make up your mind one way or the other as to whether or not you want to talk to us, let me tell you what we've got". The prosecutor then informed the defendant of the information the police had. The defendant then gave a statement confessing to the two murders at issue. The court ruled that the defendant's election to confess was neither forced nor induced. The prosecutor, in response to the defendant's indecisive negative response, merely gave him information to consider in making a decision.
Additionally, as concerns waiver of the right to counsel, equivocating, indecisive statements do not amount to a request for an attorney. State v. Boothe, 532 So.2d 203 (La.App. 3rd Cir.1988); State v. Hersman, 511 So.2d 476 (La.App. 5th Cir.1987), writ denied, 521 So.2d 1165 (La.1988). Unlike invoking the right to silence, once a defendant invokes his right to counsel, interrogations must cease and cannot resume unless counsel for defendant is present.
In his written reasons for denying defendant's motion to suppress, the trial judge found that the defendant never asked for counsel nor indicated that he wished not to make a statement. Based on this factual determination, the trial court ruled that the defendant's statement was voluntary. Considering the additional evidence presented at trial along with the evidence presented at the suppression hearing, the trial court did not err in denying the motion to suppress defendant's confession. Defendant's equivocating, indecisive statements during his confession were not tantamount to invoking his right to silence or right to counsel.
Suppression of Physical Evidence
The defendant presented two bases for suppression of the physical evidence seized at the Simpson home, lack of a warrant and lack of consent or any other exception to the warrant requirement. At the suppression hearing, the State's only witness was Detective *474 Sergeant Sherry Poole, the crime scene technician. Fontenot did not testify at the pre-trial suppression hearing. Therefore, the evidence of his consent to search the house was inferred from Poole's description of his cooperation in recovering some of the evidence and her perception of his authority to verbally consent to the search based upon his shared dominion and control over the house.
At trial, Fontenot testified that he was the boyfriend of defendant's mother, and they had decided to live together at 103 Sand Pebble sometime before the murder occurred. Several days before March 28, 1988, Fontenot had moved in to the Simpson house, and he was slowly transferring his personal belongings from his former residence to the house. Fontenot slept at the Simpson home and came and went from it as he pleased. He had access to the bedroom where the defendant slept. When he saw the blood on the knife, Fontenot called the police. He never hesitated to show the deputies through the house, nor did he ask them to wait until the defendant or his mother came home. Apparently, Fontenot did not sign a written consent to search. However, his oral consent to search is apparent from his cooperation and participation.
At the suppression hearing, defendant presented no evidence and did not cross-examine Detective Poole, the only witness presented by the State. Poole testified that with the exception of a belt found on the floor in a closet, all items seized were in plain view. It was Poole's understanding that defendant lived at the home with his mother and Fontenot who was the mother's boyfriend. She was not specifically asked whether Fontenot explicitly gave permission to search the premises and seize the evidence. Fontenot was the one who pointed out the belt on the floor of a closet in a bedroom.
It is undisputed that the police did not obtain a warrant to search the home where the victim was found. In order for the search to be valid and any evidence seized as a result of the search to be admissible, the search must fall within one of the narrow and specifically delineated exceptions to the warrant requirement. There is no "murder scene exception" to the requirement for a search warrant. At the scene of a murder, the police may make a warrantless entry on the premises where they reasonably believe a person within is in need of immediate aid, and they may make a prompt warrantless search of the area to see if there are other victims or if the murderer is still on the premises. Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984), citing Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).
Consent to conduct a warrantless search is an exception to the warrant requirement. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). As explained in State v. Furino, 451 So.2d 1139, 1141 (La.App. 3rd Cir.), writ denied, 456 So.2d 1017 (La.1984):
Consent to search, one of these exceptions to a warrantless search, may be explained in terms of the expectation of privacy. A person who consents to a search clearly could not be heard to complain of the violation of his privacy. Similarly, the invasion of privacy may be justified by the consent of "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected". In these circumstances, a person's expectation of privacy is severely limited by the joint dominion or authority over the property which reduces the applicable constitutional protection. (citations omitted)
Additionally, the Second Circuit explained in State v. Cody, 446 So.2d 1278, 1286 (La. App. 2d Cir.1984), as follows:
The common authority stems not so much from one's property interests, but rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their numbers might permit the common area to be searched. (citations omitted)
In State v. Broussard, 560 So.2d 694 (La. App. 3rd Cir.), writ denied, 566 So.2d 981 *475 (La.1990), the police were notified that Broussard was beating his wife, and were summoned to the home by a man who lived in the Broussard home and was dating Broussard's sister. When the police arrived, they found Mrs. Broussard dying, and later seized items of physical evidence including a knife and pipewrench Broussard used to kill his wife. This court upheld the admissibility of the evidence because a resident of the Broussard home, who had joint dominion and control over the property, summoned the police to the residence and his permission was sufficient authority for the police to enter the residence.
The validity of a consent to search is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case. The factual determinations of the trial judge are entitled to great weight on appellate review. A written consent to search is not required; an oral consent to search is sufficient. State v. Ossey, 446 So.2d 280 (La.), cert. denied, 469 U.S. 916, 105 S.Ct. 293, 83 L.Ed.2d 228 (1984). In his written reasons for denying the suppression of the physical evidence, the trial judge ruled:
In this instance, Mr. Fontenot actually told the officer where the belt could be found and actually guided her to the location in the home, and pointing out that item to her. It is obvious to the Court that the officer not only had the knowledge and consent of Mr. Fontenot to be on and in the premises but had his full cooperation in conducting her investigation.
The "third party consent" in the present case came from Fontenot, the boyfriend of defendant's mother. Fontenot lived in the house with defendant and his mother. As a resident of the house where the murder occurred, Fontenot had dominion and control over the property, and his permission or consent was sufficient authority for the police to enter. The evidence supports the trial court's conclusion that Fontenot had sufficient common authority over the house to consent to the search and seizure of physical evidence of the crime.

CONCLUSION
For the above and foregoing reasons, the defendant's conviction and the sentence imposed are affirmed. The district court is directed to inform defendant of the La. C.Cr.P. art. 930.8 three-year prescriptive period for seeking post-conviction relief by sending appropriate written notice to the defendant within ten days of the rendition of this opinion. The district court must file, in the record of this proceeding, written proof that defendant received the notice.
AFFIRMED.